NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 31

No. 22-AP-197

| | |
|---|---|
| Zephryn (Stephanie) Hammond | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| University of Vermont Medical Center | February Term, 2023 |

Helen M. Toor, J.

Zephryn Hammond, Pro Se, Burlington, Plaintiff-Appellant.

Elizabeth K. Rattigan and Brendan Sage of Downs Rachlin Martin PLLC, Burlington, for
 Defendant-Appellee.


PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.    **WAPLES, J.**    Plaintiff Zephryn Hammond appeals the decision of the civil division awarding summary judgment to defendant University of Vermont Medical Center on plaintiff's claims of employment discrimination and retaliatory discharge.[1] We affirm.

I.

¶ 2.    Defendant terminated plaintiff's employment in April 2019. In October 2019, plaintiff filed a complaint alleging that defendant had discriminated and retaliated against plaintiff

---

[1] This Court previously granted plaintiff's motion to amend the case caption to reflect their chosen name and to use plaintiff's preferred pronouns (they/their/them) in this opinion.

based on plaintiff's race and disabilities in violation of the Vermont Fair Employment Practices Act (FEPA). In February 2022, defendant moved for summary judgment, which plaintiff opposed.

¶ 3. The following facts were undisputed for purposes of summary judgment. Plaintiff is African American. From 2002 until April 2019, plaintiff was employed by defendant in its histology laboratory, which processes patient tissues and specimens. Plaintiff's last position was as a senior histotechnologist.

¶ 4. Plaintiff experienced several medical issues while employed with defendant for which plaintiff requested leave or accommodations, including Crohn's disease, hysterectomy surgery, a shoulder injury, and plantar fasciitis.[2] Plaintiff received approval for several accommodations, including limitations on lifting, more frequent breaks and changing their break time, and sitting rather than standing. Plaintiff was also granted many weeks of leave under the Family and Medical Leave Act.

¶ 5. Over the years, plaintiff's written performance-evaluation ratings were generally positive. However, the evaluations contained criticisms about plaintiff's poor communication, lack of respect for a supervisor, resistance to guidance and suggestions, lack of maturity, pushback when asked to do tasks, and attitude. In a self-review completed in 2009, plaintiff stated that "[o]verall, my attitude could be a bit better." Plaintiff and a coworker, Jeannette Mitchell, did not get along. Another coworker testified that Mitchell micromanaged everyone in the lab but was particularly critical of plaintiff.

---

[2] Plaintiff conceded that they received accommodations for their medical conditions but asserted in their statement of disputed facts that the accommodation setting a 10:45 a.m. break time was insufficient because, although it allowed plaintiff to take Crohn's medication at 11:15 a.m., it interfered with plaintiff's medication schedule when not at work. However, it is not clear that plaintiff ever raised this specific issue with Cortwright, and plaintiff testified at deposition that taking their medication at 11:15 a.m. was "not a problem." On appeal, plaintiff does not rely on this assertion to support their disability discrimination claim.

¶ 6.     Until 2016, plaintiff was supervised and evaluated by Judith Carpenter.  In 2017, Valerie Cortwright became plaintiff's new supervisor.  Cortwright had worked in the histology department since 2004.  Plaintiff and Cortwright were friendly and had socialized together.  According to plaintiff, their relationship changed when Cortwright was promoted.  Cortwright was the only supervisor in the histology department and managed several other employees.

¶ 7.     In June 2018, Cortwright gave plaintiff a verbal warning about "some longstanding issues that we are confident can be improved."  In an email memorializing the verbal warning, Cortwright identified four areas that needed improvement, including accepting and completing assigned tasks; maintaining professionalism in interacting with colleagues; adequately communicating with colleagues regarding workflow issues, including informing others if plaintiff needed to leave the work area or was unable to complete a task; and "accepting responsibility for [their] conduct, and working actively to foster a positive work environment and productive relationships with colleagues."[3]

¶ 8.     A week later, Cortwright sent plaintiff another email providing specific examples of the conduct that Cortwright had identified in the earlier email.  Cortwright stated that there had been instances when plaintiff was asked to complete a task but had suggested that another coworker or Cortwright do the task themselves.  On multiple occasions, plaintiff had reported late to certain assignments.  Plaintiff also frequently failed to respond when spoken to by Cortwright

---

[3] The parties disagree about what precipitated the verbal warning.  Cortwright told human resources officer Colleen Gallagher that plaintiff had snapped at Mitchell.  Plaintiff asserts that this explanation was false because the incident when they snapped at Mitchell actually occurred in late July.  According to plaintiff, the June 22 verbal warning was issued in retaliation for their complaint to Cortwright on June 5, 2018, that Mitchell's behavior was racially motivated.  However, the record does not support plaintiff's assertion that they complained to Cortwright of racial discrimination on June 5.  Plaintiff testified that they told Cortwright on that date that Mitchell was being "super condescending" and "harboring all this negativity," and referred to a previous conversation between Cortwright and former supervisor Carpenter about whether Mitchell could be racist.  This oblique reference to alleged past speculation between Cortwright and Carpenter about Mitchell's motivations cannot reasonably be construed as a complaint by plaintiff that Mitchell was targeting plaintiff due to their race.

or Mitchell. Cortwright stated that plaintiff had left the work area without informing coworkers, resulting in confusion over what step a sample was in or where it had come from. Cortwright stated that much of the lab's work was time sensitive and that by leaving the work area without notifying coworkers, plaintiff put completion of important tasks at risk.

¶ 9. Plaintiff's 2018 performance evaluation rated them as "meeting many expectations," which was a lower rating than plaintiff had received previously. Plaintiff sought reconsideration of the evaluation, alleging that Cortwright had been influenced to give them a lower rating by Mitchell. Plaintiff asserted that Mitchell was seeking revenge against plaintiff because the previous supervisor thought highly of plaintiff. Plaintiff also stated, "I can't help but feel discriminated against for reasons beyond my control, i.e.: Crohn's, plantar fasciitis, shoulder injury, post-op, and lastly my race? I can't help but think race has something to do with it." Cortwright met with plaintiff to review the evaluation and subsequently sent plaintiff a letter stating that she would revise some of the language in the evaluation, but that plaintiff's overall rating would remain unchanged.

¶ 10. In November 2018, Cortwright provided plaintiff with a "letter of understanding." The letter stated that this was "the second level of corrective action" concerning plaintiff's performance. The letter identified similar issues as the verbal warning, including leaving the work area for extended periods without informing colleagues, not communicating with colleagues in a respectful manner, and questioning assigned tasks in a manner that was disruptive to workflow. The letter also stated that "you frequently deny responsibility for errors that were clearly yours, and you do not demonstrate an understanding of the risk these errors pose to patient care."

¶ 11. Plaintiff met with Cortwright and a human resources (HR) officer, Lisa Armstrong, in January 2019 to discuss the corrective action and plaintiff's working relationship with Mitchell. After the meeting, Armstrong sent an email to plaintiff and Cortwright to summarize what was discussed at the meeting. The summary did not mention any allegation that plaintiff had been

4

discriminated against based on their race or medical condition. Instead, the summary stated that plaintiff felt Mitchell was condescending to plaintiff, was always judging plaintiff, and simply did not like plaintiff.

¶ 12. Plaintiff met with another HR officer, Colleen Gallagher, shortly afterward. Plaintiff told Gallagher that plaintiff and Mitchell had always had issues, and that Mitchell had said that she did not like plaintiff because she felt the previous supervisor, Judith Carpenter, had always favored plaintiff. Plaintiff also told Gallagher that before Cortwright became supervisor, plaintiff asked Cortwright if she thought Mitchell was racist. Cortwright said she did not know. Later, when Cortwright became supervisor, she said that Mitchell was not racist. Gallagher's note stated that "[plaintiff] said [they] never thought [Mitchell] was racist but [they] recently learned that being racist doesn't just mean someone using racist terms," but can also include when someone is treated differently due to their race. Plaintiff told Gallagher that it was hard to prove that plaintiff was being treated differently because of their race but they did not know of another reason. Plaintiff stated that they were the only African American in the department.

¶ 13. Gallagher investigated plaintiff's complaint and subsequently wrote to plaintiff that she could not substantiate that plaintiff had been targeted or discriminated against. Gallagher stated that plaintiff could send her any additional documentation and she would review it. Plaintiff did not send Gallagher any additional information.

¶ 14. In February 2019, Cortwright issued a "final written warning" to plaintiff. The letter stated that plaintiff had continued to deny responsibility for mistakes, often refused to follow directions and established processes, and felt that they should only be held accountable for actual, and not potential, patient harm. Plaintiff appealed the final written warning internally. Cortwright upheld the warning, stating that the concerns listed were valid and that she was not confident that plaintiff would address them going forward. Plaintiff then appealed to Cortwright's supervisor, who also upheld the warning.

5

¶ 15. In April 2019, Cortwright terminated plaintiff's employment. In a letter, Cortwright stated that since the final written warning was issued in February, there continued to be concerns with plaintiff's performance, "most recently a missed specimen on 3/23/19 and a no call no show on Monday 4/1/19." Plaintiff did not dispute that in late March 2019 they failed to see an urgent bone marrow biopsy for which they were responsible and missed a blinking red light signaling that a voicemail message had been left regarding the biopsy. With regard to the "no call no show," plaintiff asserted that Cortwright told plaintiff that they "had the option" not to work that day. Plaintiff did not appeal the termination.

¶ 16. Plaintiff testified at deposition that they were the only African American who worked in the lab in 2018 and 2019, although they were not the only person of color. Although plaintiff felt "singled out" by some colleagues, plaintiff could not recall those individuals making any offensive comments to plaintiff about race. Cortwright testified that she was never told of such comments by others.

¶ 17. In addition to the above facts, plaintiff alleged that the following facts were material to their claim. Plaintiff alleged that "Mitchell engaged in a near-constant campaign of criticisms, micromanagement, and condescending and belittling behavior toward plaintiff that she did not release on anyone else," and that other coworkers confirmed this. Plaintiff asserted that Mitchell and other coworkers did not like plaintiff because plaintiff had been the former supervisor's favorite. Plaintiff complained to Cortwright about Mitchell's behavior, but Cortwright failed to act. Two of plaintiff's coworkers were concerned about how Mitchell treated plaintiff. However, neither of them told management or testified at deposition that Mitchell's treatment was related to plaintiff's race or medical conditions.

¶ 18. Plaintiff also points to testimony by another histotechnologist, Elisha Johnson, that she once heard a male lab employee refer to plaintiff as an "urban princess" outside of plaintiff's earshot, which Johnson assumed was a reference to plaintiff's color. Plaintiff testified that the

6

male lab employee was "the type of person that has, like, a Confederate flag on his car." The male employee never made an offensive comment to plaintiff about race.

¶ 19. Plaintiff told HR officers that fifty percent of the mistakes for which plaintiff was criticized in the letter of understanding were not plaintiff's fault. Plaintiff asserted that the letter falsely stated that Cortwright met with plaintiff ten times to discuss performance issues, because some of the conversations were actually prompted by plaintiff's complaints.

¶ 20. In a June 2018 email to Cortwright, plaintiff asked why they were being made uncomfortable for having to use the bathroom so much when they needed to do so due to Crohn's disease. Plaintiff also sent an August 2018 email to HR officer Armstrong, which referred to plaintiff being criticized for needing to sit rather than stand. In a February 2019 email to Cortwright and Armstrong, plaintiff mentioned medical restrictions that caused plaintiff to do things differently or more slowly than other employees.

¶ 21. Based on these facts, the civil division concluded that plaintiff had established a prima facie case that plaintiff's termination was motivated by racial discrimination. However, it ruled that defendant had articulated a legitimate basis for the termination decision, namely, the performance issues identified in plaintiff's evaluations and during the disciplinary process, and plaintiff had failed to prove that defendant's proffered reasons were pretextual. The court determined that plaintiff failed to establish a prima facie case that plaintiff's termination was the result of disability discrimination. Finally, the court concluded that the fact that plaintiff was terminated shortly after complaining of possible racial and disability discrimination created a prima facie case of retaliation, but that defendant offered legitimate nondiscriminatory reasons for termination and plaintiff had failed to show that the stated reasons were false. It therefore granted summary judgment to defendant on each of plaintiff's claims. This appeal followed.

## II.

¶ 22.    On appeal, plaintiff argues that the trial court erred in granting summary judgment because there were numerous factual disputes that, if resolved in plaintiff's favor, support their claims of racial and disability discrimination and retaliation.  We conclude that plaintiff failed to present sufficient evidence to create a genuine issue of fact on any of their claims, and therefore affirm the decision below.

¶ 23.    We review a decision granting summary judgment de novo, using the same standard as the trial court.  Wentworth v. Fletcher Allen Health Care, 171 Vt. 614, 616, 765 A.2d 456, 459 (2000) (mem.).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a).  In determining whether there exists a genuine dispute as to any material fact, we accept the allegations made by the party opposing summary judgment as true if they are supported by affidavits or other admissible evidence, and we draw all inferences in favor of the nonmoving party.  Robertson v. Mylan Lab'ys, Inc., 2004 VT 15, ¶ 15, 176 Vt. 356, 848 A.2d 310.  A dispute of fact "is material only if it might affect the outcome."  In re Est. of Fitzsimmons, 2013 VT 95, ¶ 13, 195 Vt. 94, 86 A.3d 1026 (quotation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Kelly v. Town of Barnard, 155 Vt. 296, 305 n.5, 583 A.2d 614, 619 n.5 (1990) (quotation omitted).

¶ 24.    We begin by reviewing the legal framework applicable to employment discrimination and retaliatory discharge claims brought under Vermont's FEPA.  The FEPA makes it unlawful for an employer to discriminate against any individual based on race or disability, or to discharge or otherwise retaliate against an employee because the employee opposed discriminatory practices. 21 V.S.A. § 495(a)(1), (8).  The FEPA "is patterned on Title VII of the Civil Rights Act of 1964, and the standards and burdens of proof under [the] FEPA are identical

8

to those under Title VII." Hodgdon v. Mt. Mansfield Co., Inc., 160 Vt. 150, 161, 624 A.2d 1122, 1128 (1992).

¶ 25. When, as in this case, the evidence of discrimination is circumstantial rather than direct, we apply the three-part framework set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Robertson, 2004 VT 15, ¶ 18. Under that framework, to avoid summary judgment on a claim of employment discrimination or retaliation, the plaintiff must first establish a prima facie case by demonstrating that they suffered an adverse employment action under "circumstances which give rise to an inference of unlawful discrimination." Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981). The elements of a prima facie case vary depending on the type of claim being asserted and the facts of each case. Robertson, 2004 VT 15, ¶ 25. If the plaintiff establishes a prima facie case, it becomes the employer's burden to articulate "a legitimate, nondiscriminatory reason for the challenged conduct." Gauthier v. Keurig Green Mountain, Inc., 2015 VT 108, ¶ 15, 200 Vt. 125, 129 A.3d 108. If the employer comes forward with a legitimate explanation for the conduct, then the plaintiff has the ultimate burden of proving "that the proffered reason was a 'mere pretext' for discrimination. Id. (quoting Murray v. St. Michael's Coll., 164 Vt. 205, 210, 667 A.2d 294, 299 (1995)). Using this framework, we analyze each of plaintiff's claims in turn.

A. Racial Discrimination Claim

¶ 26. We first consider plaintiff's claim that their termination was motivated by racial animus. To establish a prima facie case of racial discrimination under the FEPA, plaintiff must show that (1) they belonged to a protected group; (2) they were qualified for the position; (3) they suffered an "adverse employment action"; and (4) "the circumstances surrounding this adverse employment action permit an inference of discrimination." Robertson, 2004 VT 15, ¶ 25. Plaintiff's burden at this initial stage is "relatively light." Hodgdon, 160 Vt. at 159, 624 A.2d at

9

1127; see also Carpenter v. Cent. Vt. Med. Ctr., 170 Vt. 565, 566, 743 A.2d 592, 595 (1999) (mem.) (describing plaintiff's burden of proof in prima facie case as "minimal" and "de minimis").

¶ 27.    It is undisputed that plaintiff has established the first three elements of a prima facie case: plaintiff is African American, was qualified for the senior histotechnologist position, and suffered an adverse employment action in the form of termination. Defendant argues, however, that the circumstances surrounding plaintiff's termination do not give rise to an inference of discrimination because plaintiff failed to demonstrate that non-African-American employees who were treated more favorably had similar performance issues as plaintiff. See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (stating that to establish fourth element of prima facie case for gender discrimination, plaintiff had to show she was treated differently than other similarly situated males, and those comparators must be "similarly situated in all material respects"). We are not persuaded that the law requires such a specific showing at the initial stage of the McDonnell Douglas inquiry in every case. "[B]ecause the facts inevitably vary in different employment discrimination cases, . . . the prima facie proof required in a given case will depend on the specific facts in question." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). As the Second Circuit has explained, the comparator in a disparate-treatment claim must be similarly situated, not "identically situated." Id. at 54. Thus, "[i]n the run of the mill discrimination cases, . . . a plaintiff can make a showing of disparate treatment simply by pointing to the adverse employment action and the many employees who suffered no such fate." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).

¶ 28.    Here, plaintiff testified at deposition that they were the only African-American person who worked in the lab during 2018 and 2019; that their supervisor, Cortwright, constantly watched plaintiff, did not allow plaintiff to take a full break when others were permitted to do so, and gave plaintiff longer assignments to a particular location than others were given; that coworkers had observed that Mitchell, the lead histotechnologist in the lab, singled out plaintiff

10

for harsher criticism and feedback than other technologists; and that Cortwright relied on Mitchell's opinions about plaintiff's performance in evaluations and in the disciplinary process that ultimately led to termination.[4] We agree with the trial court that this evidence was sufficient to meet plaintiff's "very light burden" of showing that the circumstances surrounding their termination suggest unlawful discrimination based on race. Robertson, 2004 VT 15, ¶ 30; see also Boulton v. CLD Consulting Eng'rs, Inc., 2003 VT 72, ¶ 16, 175 Vt. 413, 834 A.2d 37 (holding that plaintiff established prima facie case of discrimination based on sex by showing she was qualified female engineer who lost her managerial position and was replaced by male manager); cf. Shumway, 118 F.3d at 64 (holding plaintiff failed to meet fourth element of prima facie case because individuals to whom she attempted to compare herself reported to different supervisors than she did).

¶ 29.    Because plaintiff established a prima facie case of race-based discrimination, the burden shifted to defendant to produce a "legitimate, nondiscriminatory reason for the challenged conduct." Murray, 164 Vt. at 210, 667 A.2d at 299. "In order to prevent summary judgment in favor of the plaintiff at this stage, the employer's explanation must, if taken as true, permit the conclusion that there was a nondiscriminatory reason for the adverse action." Gauthier, 2015 VT 108, ¶ 20 (quotation omitted).

¶ 30.    Here, defendant provided such a reason: the performance issues identified in plaintiff's evaluations and during the progressive disciplinary process. These included poor communication, lack of attention to detail, resistance to constructive feedback, the missed biopsy in March 2019, and plaintiff's "no call no show" on April 1, 2019. Plaintiff was counseled about communication and other issues as early as 2008, when plaintiff was still under the supervision of Judith Carpenter, with whom plaintiff had a good relationship. "Terminating an employee because

---

[4] Plaintiff alleged that the person hired to replace them was Caucasian but presented no admissible evidence to support this assertion.

11

he fails to perform satisfactorily is a legitimate and nondiscriminatory reason to end his employment." Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 588 (6th Cir. 2002). Further, "[a] legitimate reason for discharge may include the plaintiff's lack of improvement in the specific areas in which she was counseled." Doucette v. Morrison Cnty., Minn., 763 F.3d 978, 983 (8th Cir. 2014) (quotation omitted).

¶ 31. Once defendant produced a legitimate, nondiscriminatory justification for terminating plaintiff's employment, the burden shifted back to plaintiff to demonstrate an issue of fact about whether defendant's reason was pretextual. "Bluntly stated, to show pretext, a plaintiff must establish that the defendant's proffered legitimate, nondiscriminatory reason is a lie." Gauthier, 2015 VT 108, ¶ 22.

¶ 32. Plaintiff asserts that many of the reasons identified by defendant for disciplining plaintiff were false or did not occur in the way that defendant characterized them. Plaintiff argues that the June 2019 verbal warning was based on false accusations and that when asked for examples of the conduct outlined in the verbal warning, Cortwright identified incidents that occurred after the verbal warning. Plaintiff also asserts that some of the specific instances of poor performance identified by Cortwright in the letter of understanding and written warning were inaccurate, and that plaintiff was unfairly blamed for errors that they did not make. Plaintiff claims that Gallagher failed to conduct a full and fair investigation of plaintiff's claims of racial and disability discrimination. Plaintiff also asserts that the missed bone marrow specimen was actually Mitchell's fault.

¶ 33. Without more, these arguments are insufficient to show pretext. "[A]n employer need only honestly believe in its proffered legitimate, nondiscriminatory reason for the challenged adverse employment action in order to prevail on a motion for summary judgment at the pretext stage." Gauthier, 2015 VT 108, ¶ 29. Thus, "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a

12

decision are right but whether the employer's description of its reasons is honest." Id. ¶ 32 (quotation omitted).

¶ 34. While plaintiff claims that defendant had its facts wrong and that its investigation was inadequate, plaintiff has not demonstrated "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" from which a jury could infer that the reasons were pretextual. Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 (2d Cir. 2013). To the contrary: defendant consistently identified a pattern of poor communication, resistance to feedback, and lack of concern about how errors jeopardized patient safety as reasons for disciplining plaintiff, and it consistently identified the missed bone marrow specimen and plaintiff's April 2019 "no call no show" as the ultimate reasons for firing plaintiff. Plaintiff admits that these two latter incidents occurred.[5] Plaintiff also conceded that they had communication issues as early as 2008 and that their former supervisor made other criticisms similar to those later identified by Cortwright. Plaintiff has failed to provide other evidence from which a jury could conclude that plaintiff's termination was actually motivated by race, such as evidence that other, non-African-American employees who had similar performance issues were not disciplined or terminated, or that defendant deviated from its normal policy or practice in how it treated plaintiff.[6] See Boulton, 2003 VT 72, ¶¶ 19-24 (analyzing claim of pretext based on allegedly differential treatment of male managers who were similarly situated); Mellin v. Flood Brook Union Sch. Dist., 173 Vt. 202, 212, 790 A.2d 408, 418 (2001) (recognizing that employer's

---

[5] Although plaintiff argues that Cortwright indicated in an email that they had permission not to attend work on April 1, 2019, this evidence is not in the record.

[6] The only statement that could potentially be construed as evidencing racial animus—the "urban princess" remark—was made by a male histotechnologist outside of plaintiff's presence. There is no evidence that this individual was involved in the termination decision or that Cortwright was aware of his remark. "A statement will not be considered direct evidence of an employer's discriminatory intent if it is made by an individual who was not a participant in the decision-making process." Robertson, 2004 VT 15, ¶ 20 (quoting 1 L. Larson, Employment Discrimination § 8.07[3], at 8–86 (2d ed. 2003)).

13

failure to follow established policy may be evidence of pretext). Under these circumstances, defendant was entitled to summary judgment on plaintiff's racial-discrimination claim.

B. Disability Discrimination Claim

¶ 35. We turn to plaintiff's claim that they were terminated because of their disabilities. To establish a prima facie case of disability discrimination based on an adverse employment action, a plaintiff must show that: (1) they were an individual with a disability; (2) the employer was notified of their disability; (3) they were "otherwise qualified to perform the job, with or without reasonable accommodations"; and (4) they "suffered an adverse employment action because of [their] disability." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (quotation omitted). It is undisputed that the first three factors were satisfied. However, plaintiff failed to provide evidence sufficient to create an inference that their termination was related to their disabilities.

¶ 36. The record shows that plaintiff had multiple medical conditions of which defendant was aware and that defendant had provided various accommodations to plaintiff over the years, including allowing plaintiff to sit rather than stand, limiting the amount of weight plaintiff had to lift, granting multiple leave requests, and allowing plaintiff to take frequent breaks. Plaintiff acknowledges these accommodations but asserts that they were harassed and ultimately terminated due to their medical conditions.

¶ 37. Plaintiff first argues that Jeannette Mitchell bullied and harassed plaintiff and that another coworker "rolled her eyes" when plaintiff asked for help. Plaintiff points to no evidence that this behavior was connected to plaintiff's disabilities. Plaintiff also contends that Cortwright gave plaintiff negative performance reviews for taking breaks that had been approved and were necessary to manage plaintiff's Crohn's symptoms and shoulder and foot pain. This is a mischaracterization of the record. In the reviews, Cortwright criticized plaintiff not for taking the breaks, but for leaving the work area without communicating to coworkers that they were doing

14

so, sometimes in the middle of a task. Plaintiff also claimed that they were criticized for sitting rather than standing when they had been given permission to sit. However, neither the 2018 performance evaluation nor the disciplinary warnings mention sitting as an issue. Finally, plaintiff asserted that another coworker who took unscheduled breaks due to gastrointestinal issues was not reprimanded, but plaintiff did not support this assertion with any admissible evidence. This record is simply insufficient to create an inference that plaintiff's employment was terminated because of their disabilities. The trial court therefore properly granted summary judgment on this claim.

## C. Retaliation Claims

¶ 38. Finally, plaintiff claims that they were terminated in retaliation for complaining to management about racial and disability discrimination. To avoid summary judgment on these claims, plaintiff first had to present a prima facie case of retaliatory discrimination by showing "that (1) [they were] engaged in a protected activity, (2) [their] employer was aware of that activity, (3) [they] suffered adverse employment decisions, and (4) there was a causal connection between the protected activity and the adverse employment decision." Murray, 164 Vt. at 210, 667 A.2d at 299.

¶ 39. Here, as with plaintiff's other claims, defendant concedes that the first three elements are satisfied. We therefore consider whether there was a causal connection between the protected activity and the adverse decision. Plaintiff appears to argue that the first retaliatory adverse employment decision was the verbal warning Cortwright issued on June 22, 2018. However, the first documented instance of plaintiff complaining of disability discrimination was in plaintiff's response to Cortwright's email about the verbal warning. This was followed by plaintiff's complaint to Lisa Armstrong that they were being criticized for sitting rather than standing. As discussed above, plaintiff's first complaint to management of racial discrimination occurred in August 2018, when they appealed the 2018 performance evaluation. See infra, ¶¶ 7 n.3, 9. This was also after the verbal warning. Although plaintiff asserts that they complained to

15

Cortwright that Mitchell was racist earlier in June 2018, there is no admissible evidence to support this assertion. The verbal warning therefore cannot be viewed as retaliatory, since it occurred before plaintiff engaged in any protected activity.

¶ 40. Plaintiff also appears to claim that they were terminated in retaliation for their complaints to HR that they were the subject of racial and disability discrimination. Plaintiff made these complaints to HR officer Gallagher in February 2019, less than two months before plaintiff's employment was terminated. We agree that the relatively close proximity between the complaints and plaintiff's discharge was sufficient to meet the fourth element of a prima facie case. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998), abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) (holding that employee met causal-connection element of prima facie case by showing that her discharge came less than two months after she filed complaint with management and ten days after she filed complaint with human resources department).

¶ 41. In response, defendant offered legitimate, nondiscriminatory reasons for terminating plaintiff's employment—the performance issues discussed above—thereby rebutting the presumption of retaliatory discrimination. This placed the burden on plaintiff to come forth with evidence that the proffered reasons were a pretext for retaliation. See Robertson, 2004 VT 15, ¶ 42.

¶ 42. Plaintiff appears to rely solely on the closeness in time between the complaint and termination to support their retaliation claim. "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . . , but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010); see Adams v. Green Mountain R.R. Co., 2004 VT 75, ¶ 9, 177 Vt. 521, 862 A.2d 233 (mem.) ("There must be some evidence other than chronology that gives the factfinder reason to believe that the

16

timing is an indication of improper motive."). By the time plaintiff complained to HR, Cortwright had already given plaintiff a verbal warning, the letter of understanding, and the final written warning. This chronology is consistent with defendant's stated reasons for firing plaintiff. Further, plaintiff admitted the conduct that ultimately formed the basis for the termination decision—the missed biopsy and plaintiff's failure to attend work on April 1, 2019. Because plaintiff failed to demonstrate any other facts from which a jury could reasonably infer pretext, the trial court correctly granted summary judgment on plaintiff's retaliation claims as well.

Affirmed.

FOR THE COURT:

_____
Associate Justice