Filed 01/21/26

VERMONT SUPERIOR COURT

Rutland Unit
83 Center St
Rutland VT 05701
802-775-4394
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 25-CV-02503

---

Tammy Howard Davis v. Vermont State Colleges, DBA Community College of Vermont

---

### Decision and Ruling on Defendant's Partial Motion to Dismiss

In this civil action, Plaintiff Tammy M. Howard Davis sues her employer, Defendant Vermont State Colleges (d/b/a Community College of Vermont) ("CCV") for harassment, disability discrimination, retaliation, third-party retaliation, promissory estoppel, intentional infliction of emotional distress ("IIED"), and negligent hiring, retention, and supervision of employees. Defendant now moves to dismiss the claims for retaliation, promissory estoppel, and IIED.

### Procedural Standard

A motion to dismiss for failure to state a claim faces a high bar. The Vermont Supreme Court has described the familiar standard for Rule 12(b)(6) motions to dismiss for failure to state a claim as follows:

> "A motion to dismiss ... is not favored and rarely granted." This is especially true "when the asserted theory of liability is novel or extreme," as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allegations as true, "'it appears beyond doubt' that there exist no facts or circumstances that would entitle the plaintiff to relief." We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.

*Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309, 316-17 (citations omitted); *see also* 5B A. Benjamin Spencer, *et al.*, *Fed. Prac. & Proc. Civ.* § 1357 (4th ed.) ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief exists.")

1

The Court assumes that the following facts in the Complaint are true for purposes of analysis of the motion to dismiss. See *Montague v. Hundred Acre Homestead, LLC*, 2019 VT 16, ¶ 10, 209 Vt. 514.

Plaintiff is 58 years old, married, heterosexual, and Catholic, and resides in the Town of Castleton, Vermont. She has been employed full-time at CCV for over 27 years. In her current position, she is a Senior Academic Advisor. She alleges that she is qualified for her position and has always performed it in an exemplary manner. In December 2023, Plaintiff was a contact person for 311 and 311 A complaints.

1. Third-party retaliation claim:

Ayla Thompson is an administrative assistant and is Plaintiff's close friend. Candice Britt is CCV's regional office manager. Thompson allegedly complained that Britt was discriminating, harassing, and retaliating against her because Thompson had helped a disabled student file a discrimination complaint against Britt and because Thompson had a disabling condition. Plaintiff allegedly helped Thompson file her complaint. According to Plaintiff, CCV knew that Plaintiff helped Thompson file the complaint and that she and Thompson were close friends.

Plaintiff alleges that as a result, she suffered several adverse employment actions that materially affected her job or would deter a reasonable person from complaining about harassment, including being scolded at a meeting for directing Thompson's complaint to the wrong person, and falsely accusing her at the same meeting of having an inappropriate relationship with Thompson. She alleges that Jenney Izzo, her immediate supervisor, tried to take away her flexible work-at-home arrangements. According to Plaintiff, Britt starting "stalking" Plaintiff's students to see if Plaintiff "was doing anything wrong, something that was not part of [Britt's] job and wasn't done to other teachers." Complaint, ¶ 53(d). Around September 2024, when Thompson returned from maternity leave, Britt allegedly warned Plaintiff about having "closed door" conversations with Thompson. *Id.*, ¶ 53(e).

Plaintiff alleges that fewer than two months had elapsed between the time in which she helped Thompson file her complaint in December 2023 and the beginning of the retaliation in February 2024. She alleges that CCV did not have any legitimate, non-retaliatory reasons for taking the actions against her.

2. Promissory estoppel claim

In or around 1998, CCV's president, Tim Donovan, interviewed Plaintiff for her first position at CCV. Donovan allegedly promised Plaintiff that if she took the CCV position, which paid less than her current position, she would receive free tuition for her family members, free health care for life if she worked there for 15 years and was 55 or older, and a deposit of 12% of her pay by CCV into her 401k. According to Plaintiff, Donovan intended for her to rely upon those promises and benefited from her reliance on those promises. Plaintiff would not have accepted the CCV position without these promises.

CCV recently allegedly told Plaintiff that she does not qualify for the health care benefit, despite a committee having allegedly determined twice that she was "grandfathered" into this benefit. CCV has also allegedly reduced the amount they fund her 401k.

3. IIED

Plaintiff allegedly suffered sadness, fear, embarrassment, humiliation, and anxiety caused by the wrongful, extreme, outrageous, and intentional conduct of CCV's managers and employees, including harassment due to religion, disability, sex, age, and ancestry.

The alleged harassment is described in Count I of the Complaint. The coordinator of student advising, Nathan Astin, and Britt allegedly "hounded" Plaintiff about whether she had published a prayer in the Rutland Herald. *Id*., ¶ 15(a). Astin, upon learning that Thompson was pregnant, allegedly told Plaintiff that Thompson should "just kill it." *Id*., ¶ 15(b). When Plaintiff's father-in-law died, Astin and Britt allegedly "continually harassed" Plaintiff about why no obituary was in the newspaper and asked her 8 to 10 times for the time and date of his memorial service. *Id*., ¶ 15(c). On one occasion, Astin, with Britt present, "did an exaggerated sign of the cross." *Id*., ¶ 15(d).

In relation to Thompson's pregnancy, Astin allegedly said to Plaintiff that "that's why there is abortion," "what about condoms," and "people are stupid. Britt allegedly did not acknowledge Thompson's pregnancy until Thompson was about to go on maternity leave. *Id.*, ¶ 15(e).

Izzo and Mary Brodsky, CCV's human resources director, allegedly "made" Plaintiff apologize to Astin at a meeting that Plaintiff requested to complain about the religious harassment. *Id.*, ¶ 15(f). Izzo and Brodsky then allegedly excused Astin for saying "I love you T-Bones" to Plaintiff "because he had known Plaintiff a long time. *Id.*, ¶ 15(g). Izzo then allegedly accused Plaintiff of having an inappropriate relationship with Thompson because Thompson had left Plaintiff a note that said, "I love you." *Id.*

Astin also allegedly would try at least once a day "to grab meat from the lunch plates" of Plaintiff, Thompson, and other female co-workers while they ate. *Id.*, ¶ 15(k). Astin allegedly said 5 to 10 times that "Big Ang needed more air in her tires" whenever Plaintiff needed surgery for disabling conditions. *Id.*, ¶ 15(l). This was allegedly a reference to a reality TV star with a large bosom. *Id.*

Plaintiff allegedly suffered disabling conditions after being injured while using a broken ramp at CCV's Rutland campus in August 2020. The injury allegedly affects her sitting, walking, and standing. When Plaintiff requested a printer closer to her office after two years, Britt allegedly slammed the printer cartridge for the printer in anger in front of Plaintiff. Izzo said "oh god, look at that wreck" in front of Plaintiff when they saw a disabled person struggling to walk down the street. *Id.*, ¶ 15(o). When Plaintiff told Izzo that her father-in-law was terminally ill, Izzo allegedly asked Plaintiff, "when is he going to go?" *Id.*, ¶ 15(p). Britt allegedly used "air quotes" when talking about Plaintiff's disability, and she sought to limit access of a disabled CCV student to Plaintiff's department.

CCV allegedly assigned tasks to Plaintiff, such as being an usher at graduation, when they knew the task involved walking and standing. Meanwhile, Britt "was allowed to drive around on a golf cart." *Id.*, ¶ 15(s). CCV's president, Joyce Judy, allegedly asked Plaintiff to come up to the water tower at a CCV racetrack event, despite knowing that Plaintiff could not do that due to her disabling conditions. In January 2025, one of Britt's work study students

4

allegedly pretended to be Plaintiff walking with a cane. Plaintiff discussed this with her new supervisor, Kim Martin, who assured Plaintiff that Britt had reported the situation and dealt with the student. Later that month, the same student allegedly re-labeled Plaintiff's interoffice mailbox with his own name and moved Plaintiff's box to the very bottom. Her complaints about the mailbox went unanswered.

Izzo allegedly stated that she was going to make team-building events such as rollerblading and bowling mandatory, despite knowing that Plaintiff could not participate due to her disabling conditions.

In or around December 2023, Izzo allegedly asked Plaintiff three times if she wanted to change to part-time employment, despite Plaintiff telling her she did not want to do that. Izzo allegedly did not ask younger employees the same question. When asked why she asked this question, Izzo replied that Plaintiff was "at that time in your life that you would want to work part-time and keep your benefits." *Id.*, ¶ 15(x).

According to Plaintiff, from around January 2024 to February 2024, Izzo "falsely wrote up" six senior employees whom she supervised. Tiffany Walker, the Associate Dean of Workforce Education, twice allegedly asked Tammy "when are you going to retire"? *Id.*, ¶ 15(z). That spring, Izzo allegedly "forced" Mary Castine, an administrative assistant at the Brattleboro campus, to retire. *Id.*, ¶ 15(aa).

Astin allegedly referred to Plaintiff as "Big Ang," the nickname of a reality TV personality who purportedly had a connection to the Italian mafia and a felony record. In the last 5 to 7 years, Astin also allegedly called Plaintiff "T-Bones" in front of other employees, as many as 42 times in one week, despite her telling him that she preferred her name, Tammy. T-Bones is allegedly the name of a gang member, and according to Plaintiff, this nickname insinuates that because she is of Italian descent, she is also in the mafia or is a criminal.

<u>Discussion</u>

Defendant moves to dismiss the claims for third-party retaliation, promissory estoppel, and IIED.

1. <u>Third-party retaliation under FEPA</u>

The provision within Vermont's Fair Employment Practices Act ("FEPA") prohibiting retaliation provides, in pertinent part:

> An employer . . . shall not discharge or in any other manner discriminate against any employee because the employee . . .
> (A)     has opposed any act or practice that is prohibited under this chapter[.]

21 V.S.A. § 495(a)(8)(A).

A prima facie case under this provision requires allegations of fact related to the following four elements: (1) the employee engaged in a protected activity by opposing an employment act or practice that is prohibited under FEPA; (2) his employer was aware of the protected activity; (3) he suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action. See *Hammond v. Univ. of Vt. Med. Ctr.*, 2023 VT 31, ¶ 38; *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 42, 176 Vt. 356; see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1974) (outlining prima facie elements for a discrimination claim under Title VII of the Civil Rights Act of 1964).

In analyzing retaliation claims based on circumstantial evidence under FEPA at the summary judgment stage and at trial, the Vermont Supreme Court follows the burden-shifting analytical framework recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1974). See *Hammond, v. Univ. of Vt. Med. Ctr.*, 2023 VT 31, ¶ 25; *Gauthier v. Keurig Green Mtn., Inc.*, 2015 VT 108, ¶ 15, 200 Vt. 125. That framework requires the plaintiff to initially prove, by a preponderance of the evidence, the four essential elements described above. The burden-shifting framework of *McDonnell Douglas* then comes into play. It "is an evidentiary standard, not a pleading requirement," and thus is applied only on summary judgment or at trial. *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002). To survive a motion to dismiss, only notice pleading on the four essential elements is required. *Id*. at 511.

The United State Supreme Court has recognized third-party retaliation claims under Title VII. See *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011). Third-party retaliation claims under Vermont's "FEPA," however, have not been recognized by the Vermont Supreme Court. A Vermont trial court has allowed a third-party retaliation claim under FEPA to survive a motion to dismiss, based on the reasoning in *Thompson*. See *Gates v.*

*Mack Molding Co., Inc.*, No. 23-cv-02626 (Vt. Super. Ct. Mar. 25, 2024) (Teachout, J.). In *Gates*, the plaintiff's wife was involuntarily terminated after she sought an accommodation from the defendant after she suffered a workplace injury. *Id*. at 2. She then filed a FEPA action against defendant, alleging disability discrimination and retaliation. *Id*. Shortly after she filed her suit, the defendant transferred the plaintiff to a different position, for which he believed he was unqualified and which he considered to be a bad, dangerous job. *Id*. at 3. The defendant also assigned the plaintiff to work under a new supervisor, who required that he keep a daily log of his work activities. *Id*. The plaintiff then overheard the defendant's human resources director saying that the plaintiff would be terminated if he responded negatively to increased scrutiny. *Id*. at 4.

The court noted in *Gates* that FEPA provides that an employer "shall not discharge or in any other manner discriminate against any employee because the employee . . . has opposed any act or practice that is prohibited under this chapter[.]" *Gates*, slip op. at 11 (quoting 21 V.S.A. § 495(a)(8)(A) (emphasis added). The court concluded that the plaintiff, "who allegedly suffered injuries because of the actions taken by his employer that were intended as retribution against his spouse for engaging in a protected activity," could bring a third-party retaliation claim under FEPA. *Id*. at 12.

To sufficiently plead a protected activity, Plaintiff must allege facts showing that Thompson acted against practices of Defendant that are unlawful under FEPA. See *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (describing protected oppositional activities for purposes of Title VII). Then she must show that she suffered a "materially adverse employment action," defined as an action that harmed her interests in such a manner that it "could well dissuade a reasonable worker" in Thompson's position from "making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006). There is no fixed class of relationships to which third-party retaliation claims are limited. See *Thompson*, 562 U.S. at 175 ("We expect that firing a close family member will almost always meet the *Burlington* standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so, but beyond that we are reluctant to generalize.")

In *Gates*, the plaintiff alleged that after the wife engaged in protected activities, the husband was moved into a position that was more dangerous and for which he was not well qualified. Here, Plaintiff alleges that at a meeting she was "scolded" for filing the report to the wrong person and "accused" of having an inappropriate relationship with Thompson. She alleges that Izzo tried to take away her flexible work-from-home arrangement but does not allege that the arrangements were altered. According to Plaintiff, Britt began to "stalk" Plaintiff's students. Finally, she alleges that over nine months after the protected activities, Britt warned her not to have "closed door" conversations with Thompson.

Defendant argues that Plaintiff cannot establish that Thompson was a spouse or close family member, but rather, is more akin to the "mere acquaintance" that the *Thompson* court opined would "almost never" meet the *Burlington* standard. The Court rejects this argument because, making inferences in Plaintiff's favor, Thompson's relationship with Plaintiff is more than mere acquaintanceship.

Next, Defendant contends that Plaintiff has not alleged any adverse employment actions. Her job did not change to less seniority or pay, or to a position that was more dangerous or for which she was not qualified. The scolding for filing the complaint to the wrong person, and the alleged defamatory statement that she was in an inappropriate relationship with Thompson are not sufficient to dissuade a reasonable worker from reporting the considerably graver concerns of discrimination against a disabled student or against Thompson herself, based on her disability. The same can be said of Izzo trying to take away Plaintiff's flexible work-from-home arrangements, but not actually following through with that consequence. The warning to avoid engaging in "closed door" conversations is extremely attenuated in time from the alleged protected activity, and not sufficient to for a reasonable worker to stifle a serious discrimination complaint. Finally, although Plaintiff alleges that Britt "stalked" her students to find out if Plaintiff had done something wrong, the stalking itself implies a misdeed, but one that largely does wrong by the students. Plaintiff does not have a cause of action for alleged third-party retaliation when she is not the third-party subjected to the adverse action. To the extent that the allegation implies that she was subjected to review, in the particulars alleged, it does not seem like it would be sufficient to dissuade a reasonable worker

in Thompson's position to chill her complaints against the graver concerns of discrimination against her disability.

2. Promissory estoppel

Defendant moves to dismiss the promissory estoppel claim because Plaintiff does not allege that Defendant has failed to provide free tuition for family members, has not alleged that Defendant has unequivocally failed to make good on its promise of free health care for life, and has not pleaded that injustice can be avoided only by enforcement of the alleged promise regarding retirement contributions.

To succeed in a claim of promissory estoppel, a "plaintiff must show that: (1) defendant made a promise to plaintiff that defendant should have reasonably expected to induce action or forbearance; (2) plaintiff relied on the promise to his detriment; and (3) injustice can be avoided only by enforcement of the promise." *Pettersen v. Monaghan Safar Ducham PLLC*, 2021 VT 16, ¶ 11, 214 Vt. 269 (citing *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 573 (1992) (adopting elements set out in Restatement (2d) of Contracts)).

The parties agree that Plaintiff has not included an allegation that Defendant has failed to provide free tuition for family members. Regarding the promise of the health care benefit, at best, Plaintiff has alleged that she has been told that she does not qualify for the benefit, but she does not plead that Defendant has revoked the benefit, which would seem to apply only after she is no longer employed at CCV. Because Plaintiff has not alleged that Defendant broke it promise, the allegations do not make a prima facie showing that Plaintiff relied on the promise to her detriment, and the promise still stands. See *Dewdney v. Duncan*, 2025 VT 26, ¶ 27 ("[T]he central promise still stands because defendant has not positively and unequivocally revoked his promise, nor has he removed plaintiffs from his will. Accordingly, plaintiffs cannot show detrimental reliance . . ."). The Court therefore grants Defendant's motion to dismiss the promissory estoppel claim about the alleged promises of free tuition and health care. This ruling does not preclude Plaintiff from bring those claims if Defendant fails to perform on those promises in the future.

As to the allegation that Plaintiff detrimentally relied on Defendant's promise that it would contribute 12% of her pay to her 401k, but has since reduced that contribution, the complaint is sufficient to survive this motion to dismiss. Defendant argues that Plaintiff does not allege that injustice can be avoided only by enforcement of the promise. Making all reasonable inferences in favor of Plaintiff, the Court cannot rule out that Plaintiff could succeed in proving the third element. Defendant argues in a footnote that its contributions to retirement accounts were reduced for all eligible employees by July 1, 2017, and therefore the claim is barred by the statute of limitations. Even if that is true, the argument necessitates the introduction of facts outside of the complaint and is therefore beyond the scope of the Court's consideration of this motion to dismiss. Therefore, the Court declines to dismiss the promissory estoppel claim about the retirement contribution.

3. IIED

Defendant contends that Plaintiff does not allege sufficiently outrageous conduct or sufficiently severe emotional distress, to sustain her IIED claim.

"Plaintiff's burden of proof on a claim of intentional infliction of emotional distress is a heavy one." *Gallipo v. City of Rutland*, 163 Vt. 83, 94 (1994). "To sustain a claim for IIED plaintiff must show defendants engaged in 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395 (quoting *Sheltra v. Smith*, 136 Vt. 472, 476 (1978)). "The conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 83 (2002) (citation omitted).

The Court considers all the conduct that Plaintiff alleges in her complaint, which includes a host of insults, unfairness, inappropriate and mocking remarks, distasteful nicknames, and insensitivity that she has endured during her employment at CCV. This conduct, if the allegations are true, may indeed form the basis of her FEPA claims.

10

Nevertheless, it is not sufficient to meet the outrageous conduct element to support an IIED claim. "Absent at least one incident of behavior that transcends the ignoble and vast realm of unpleasant and often stressful conduct in the workplace, incidents that are in themselves insignificant should not be consolidated to arrive at the conclusion that the overall conduct was outrageous." *Denton v. Chittenden Bank*, 163 Vt. 62, 67 (1994).[1] The Court accordingly grants Defendant's motion to dismiss the IIED claim.

## Order

For the reasons discussed above, Defendant's Partial Motion to Dismiss is granted with regard to the claims for third-party retaliation and intentional infliction of emotional distress. It is denied regarding the promissory estoppel claim based on reduction of retirement account contribution and granted with regard to the remaining bases for the promissory estoppel claim.

Electronically Signed on: Tuesday, January 20, 2026 pursuant to V.R.E.F. 9(d).

_____
Susan A. McManus
Superior Court Judge

---

[1] "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (2d) of Torts § 46 cmt. d.