Filed 03/25/24


STATE OF VERMONT

SUPERIOR COURT                                          CIVIL DIVISION
Rutland Unit                                          Docket No. 23-CV-2626


DONALD L. GATES, JR.,
        Plaintiffs

v.

MACK MOLDING COMPANY, INC.,
JEFFREY SOMPLE,
JESSICA FREDETTE,
NANCY CEFLO, and
BUD PAGLICCIA,
        Defendants


## DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

Plaintiff Donald L. Gates, Jr. asserts several claims against his former employer, Defendant Mack Molding Company, Inc. ("Mack Molding"), and against four current or former employees or officers of Mack Molding:  Defendants Jeffrey Somple, Jessica Fredette, Nancy Ceflo, and Bud Pagliccia (collectively hereinafter "Defendants").  Defendants move to dismiss Mr. Gates' complaint under Rule 12(b)(6) of the Vermont Rules for Civil Procedure, asserting that Mr. Gates has failed to state claims for which relief can be granted.  Defendants assert the affirmative defense of statute of limitations.[1]

Mr. Gates is represented by Siobhan M. McClosky, Esq.  Defendants are represented by Timothy E. Copeland, Jr., Esq., and F. David Harlow, Esq.  For reasons that follow, the motion is granted in part and denied in part.

Dismissal of a claim pursuant to Rule 12(b)(6) may occur only when "it is beyond a doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." *Dernier v. Mortgage Network, Inc.,* 2013 VT 96, ¶ 23, 195 Vt. 113, 121(2013).  The general pleading standard on a motion to dismiss is "exceedingly low," *Bock v. Gold,* 2008 VT 81, ¶ 4, 184 Vt. 575, 576, as "[t]he purpose of a motion to dismiss is to test the law of the claim, not the facts which support it." *Powers v. Off. of Child Support,* 173 Vt. 390, 395 (2002).  "Motions to dismiss for failure to state a claim are disfavored and are rarely granted." *Colby v. Umbrella, Inc.,* 2008 VT 20, ¶ 5, 184 Vt. 1, 6.  "We assume that all factual allegations pleaded in the complaint are true" and "accept as true all reasonable inferences that may be derived from plaintiffs pleadings." *Dernier,* 2013 VT 96, ¶ 23.

---

[1] Defendants also asserted a defense of *res judicata* which was denied during a hearing on November 28, 2023.

1

## Factual Allegations

The court assumes that the following facts in the Complaint are true for purposes of analysis of the motion to dismiss. *See Montague v. Hundred Acre Homestead, LLC*, 2019 VT 16, ¶ 10, 209 Vt. 514.

Mack Molding is a domestic for-profit corporation, with its principal place of business in Arlington, Vermont. (Compl. ¶ 9.) Mack Molding manufactures injection molded plastic parts for sale, and sells manufacturing services as well. (*Id*. ¶ 10.) Mr. Gates was employed full-time at Mack Molding's manufacturing plant in Cavendish, Vermont, as a shift technician in finishing from March, 1995, until May 11, 2019, at which time Mack Molding terminated his employment involuntarily. (*Id*. ¶ 3.)

Mr. Gates' wife, Angela M. Gates, was employed at the same plant as a molder, and then as a finisher, from December, 1996, until May 20, 2016, when Mack Molding terminated her employment involuntarily. (*Id*. ¶ 8.) In the weeks preceding her termination, Ms. Gates unsuccessfully sought a light-duty work assignment as a reasonable accommodation for a physical condition stemming from an earlier workplace-related injury. (*Id*. ¶ 26.) She also filed a claim for workers' compensation benefits, and when Mack Molding's insurance carrier denied that claim in late May of 2016, she appealed the denial to the Vermont Department of Labor. (*Id*. ¶ 30.)

On two unspecified dates—several weeks apart from each other, but within the time between late May of 2016 and late October of 2017—the manager of the maintenance department at the Cavendish plant, Ed Garrow, and an employee supervised by Mr. Garrow, Adam Holden, accused Mr. Gates of causing spills of a chemical on the plant floor. (*Id*. ¶¶ 32-33.) Mr. Gates did not cause the spills, and yet Mr. Garrow and Mr. Holden convinced another supervisor, Kevin Peets, to issue written disciplinary notices naming Mr. Gates as the responsible party. (*Id*. ¶ 32-47.) Mr. Gates told Mr. Peets that Mr. Garrow and Mr. Holden were trying to "set [Mr. Gates] up for the spill," and that this was "interfering with his job." (*Id*. ¶ 43.)

On October 30, 2017, Ms. Gates filed a civil suit against Mack Molding and others in Vermont Superior Court, Bennington Civil Division. (*Id*. ¶ 78.)[2] The suit included, *inter alia*: (1) two claims for disability discrimination under the Vermont Fair Employment Practices Act ("FEPA"), 21 V.S.A. §§ 495-496a, for Mack Molding's failure to reasonably accommodate her on two occasions; and (2) a claim of retaliation under the Vermont Employer's Liability and Workers' Compensation Act ("WCA"), 21 V.S.A. §§ 601-711, for terminating her shortly after

---

[2] Ms. Gates also named as defendants three of the four individuals who are named as Defendants in Mr. Gates' instant lawsuit: Jeffrey Somple, Mack Molding's President; Ms. Ceflo, then the director of human resources at Mack Molding; and Bud Pagliccia, the Manager of Mack Molding's Cavendish plant. (Compl. ¶¶ 76, 11, 13-14.) The fourth individual Defendant in this case is Jessica Fredette, who became the human resources director for Mack Molding in April of 2018. (*Id*. ¶ 12.)

she filed a claim for workers' compensation benefits. *See Gates v. Mack Molding Co., Inc.*, 2022 VT 24, ¶¶ 11-12, 216 Vt. 379.[3]

Right after Ms. Gates filed her civil suit, Mr. Gates was told by both Patty Plesko, a human resources manager for Mack Molding, and Defendant Bud Pagliccia, the Cavendish Plant Manager, that Mr. Gates "had to accept another position as a die setter," and report to Edgar Billings, rather than Mr. Rogstadt, who had been Mr. Gates' supervisor previously. (*Id*. ¶ 82.) When Mr. Gates responded that "he didn't want the die setting job and wanted to keep his old job[,] Patty told him he could apply for a new painter or finisher position[,] which involved lesser pay and a loss of seniority." (*Id*. ¶ 83.) Mr. Gates' career until that point had consisted of finishing-related work; he had not performed nor been trained in die setting. (*Id*. ¶¶ 3, 84, 92-93, 100.) He considered die setting a "bad job that is greasy and dangerous," and he informed his superiors that, given his lack of qualifications, die setting would be dangerous for him to perform. *Id*. ¶¶ 84, 92.) Given those concerns, Defendants assigned an "experienced tech" to work alongside Mr. Gates when engaged in die setting. (*Id*. ¶ 93.)

On November 16, 2017, Mr. Peets notified Mr. Billings, Mr. Rogstadt, and Ms. Plesko via email that another employee, Mark Harwood, would be assigned to split or share the die setting job position, together with Mr. Gates, and that each work day Mr. Rogstadt would choose whether Mr. Gates or Mr. Harwood would handle die setting. (*Id*. ¶¶ 89-90.)

On November 20, 2017, Mr. Gates met with Defendant Ceflo, then the director of human resources, and complained that the die setting assignment was retaliation for his wife's recent civil suit. (*Id*. ¶ 98.) Mr. Gates secretly recorded this meeting on a small audio recording device. (*Id*. ¶ 101.) Ms. Ceflo responded that the new job assignment had "nothing to do with" Mr. Gates' wife and promised that Mr. Gates' "job would not change." (*Id*. ¶ 99.) Mack Molding eventually made an outside hire to fill the die setting position, and Mr. Gates was allowed to keep his old job. (*Id*. ¶¶ 103-04.) Yet, he had to continue performing die setting work—sharing the position with another co-worker—on top of his other job duties, through his date of termination. (*Id*.) In the meantime, the new outside hire received training for a period lasting more than a year. (*Id*.)

During a meeting in early January, 2019, Mr. Gates learned from Mr. Pagliccia, Defendant Jessica Fredette (then the director of human resources for Mack), and another supervisor, Jon Scheiner, that Scheiner would soon become Mr. Gates' new supervisor and that Mr. Gates would be obligated to keep a daily log of his work activities. (*Id*. ¶ 152.) When Mr. Gates protested these changes as retaliation for his wife's ongoing lawsuit, and asserted that no other employee in the plant was forced to keep a work log, Ms. Fredette threatened Mr. Gates with insubordination. (*Id*. ¶ 153.)

On January 8, 2019, Mr. Gates met with Ms. Fredette and Mr. Pagliccia, and again complained that he was being subjected to retaliation because of his wife's lawsuit. (*Id*. ¶ 154.) Mr. Gates secretly recorded the audio of this meeting, even though Ms. Fredette asked him if he

---

[3] Following discovery, the trial court granted the defendants' motion for summary judgment on all of Ms. Gates' claims. *See id*. ¶ 12. Ms. Gates appealed, and in a decision issued on May 13, 2022, the Supreme Court affirmed. *See id*. ¶¶ 1, 12, 23, 37, 56.

was recording it and told him that he did not have permission to record the meeting. (*Id*. ¶ 157.) Ms. Fredette and Mr. Pagliccia denied that anyone was retaliating against Mr. Gates and ordered him to abide by their decisions, such as requiring Mr. Gates to furnish a work log to Mr. Schreiner at the end of each day of work. (*Id*. ¶¶ 159-60.) Mr. Gates reminded Ms. Fredette of statements made to him in November of 2017 by Ms. Ceflo—that Mr. Gates would be able to keep his job and would continue to report to Mr. Rogstadt—but Ms. Fredette replied that he did not have a contract with Mack Molding to that effect, and that his actions were "creating a negative work environment." (*Id*. ¶¶ 162-64.)

Later that same day, while standing outside of Ms. Fredette's office, Mr. Gates overheard and then began secretly recording Ms. Fredette while she was on a phone call. (*Id*. ¶¶ 166-171.) Mr. Gates believes she was speaking with Mack Molding's President, Jeff Somple, and she stated the following: Mack Molding could terminate Mr. Gates if he responded negatively to increased scrutiny; "one more incident with [Mr. Gates] and he's done"; she intended to request that Mr. Scheiner monitor Mr. Gates and report his findings to her; and that she had responded to Mr. Gates' claims of retaliation made earlier that day by telling him to "move on" and drop it. (*Id*. ¶¶ 171-72.)

On May 3, 2019, during the course of Ms. Fredette's deposition in Ms. Gates' civil suit, Ms. Gates's counsel (who was also Mr. Gates' counsel) introduced into the record certain audio recordings that Mr. Gates had made secretly of recent workplace conversations, including the conversation from January 8, 2019 with Ms. Fredette and Mr. Pagliccia. (*Id*. ¶ 189.) After some questioning of Ms. Fredette about the recordings, defendants' counsel halted the deposition, and thereafter formally moved to terminate it. (*Id*. ¶ 193.)[4] On May 5 and 6, 2019, Mr. Gates' counsel disclosed additional, secret workplace recordings that Mr. Gates had made in recent months. (*Id*. ¶¶ 194-96.)

On May 6, 2019, Ms. Fredette and Mr. Pagliccia appeared angry, demanded to meet with Mr. Gates, and then proceeded to lead him through the plant, to a private meeting room. (*Id*. ¶ 197-99.) Mr. Gates felt that he was intentionally "paraded . . . like a criminal through the plant," since they could have reached the same meeting room through a back stairway, out of view of the plant workers. (*Id*. ¶ 199.) During the meeting Ms. Fredette told Mr. Gates that he had to answer questions about his prior secret audio recordings and divulge the substance of his prior communications with his attorney regarding those recordings. (*Id*. ¶ 206.) Mr. Gates requested to speak with his attorney, but Ms. Fredette and Mr. Pagliccia replied that if he answered their questions, he would be able to keep his job. (*Id*. ¶¶ 207, 209.) Based on such statements, Mr. Gates felt forced to give some answers, and believed that he would be able to keep his job if he answered. (*Id*. ¶¶ 208-09.) Mr. Gates then answered some questions, but when he stopped answering further, Ms. Fredette read him a written statement—which she indicated was prepared by Mack Molding's outside legal counsel, Timothy Copeland—indicating that Mr. Gates' employment status would depend on his answering their questions. (*Id*. ¶ 210.) (Apparently, Mr. Gates then stayed silent and gave no further answers after the Copeland

---

[4] The Bennington Civil Division granted termination of the Fredette deposition after finding that the secret audio recordings should have been disclosed in discovery much earlier by the Gates' counsel.

statement was read aloud.)  Ms. Fredette then informed Mr. Gates that his employment was suspended without pay until further notice, pending an investigation.  (*Id.* ¶ 211.)

During this meeting, which lasted approximately 30 minutes, Mr. Gates felt that he could not leave the room, given that:  Ms. Fredette and Mr. Pagliccia were his superiors; they took a demanding tone and stance; they refused Mr. Gates's request to speak with his attorney; and they were in a closed room, surrounding Mr. Gates, with Ms. Fredette seated closest to the door.  (*Id.* ¶¶ 212-13.)

On May 11, 2019, Mr. Gates received a letter, signed by Ms. Fredette, indicating that his employment with Mack Molding was terminated.  (*Id.* ¶ 223.)  The letter did not state the cause of termination and did not offer a chance to appeal the termination.  (*Id.* ¶ 224.)

On June 18, 2020, Mack Molding's counsel sent the Gates' counsel an email indicating that unless Ms. Gates withdrew her pending suit and Mr. Gates agreed not to sue Mack Molding, the company would file a civil action against Mr. Gates under a federal wiretap statute and seek over $50,000 in attorneys' fees as sanctions for the withholding of workplace audio recordings. (*Id.* ¶ 253.)  Mr. Gates alleges that these threats were designed to scare and intimidate him, and that he suffered severe emotional distress and anxiety as a result.  (*Id.* ¶¶ 255-57.)  The court in Ms. Gates' case awarded defendants $1,640.00 in sanctions.  (*Id.* ¶ 253 n. 4).

On May 6, 2022 (exactly three years from the date of his suspension), Mr. Gates filed an action in federal court against Mack Molding, Mr. Somple, and Ms. Fredette.  *See Gates v. Mack Molding Co., Inc.*, No. 5:22-cv-100, 2023 WL 4181945, "Order on Motion to Dismiss," (D. Vt. Mar. 27, 2023).  The action included a claim for retaliation under the federal Family and Medical Leave Act ("FMLA"), as well as retaliation claims under Vermont's Parental and Family Leave Act, FEPA, and the WCA, together with common law claims for invasion of privacy, intentional infliction of emotional distress, breach of an implied contract and the covenant of good faith and fair dealing, and promissory estoppel.  *See id.* at *3.  The defendants moved to dismiss for failure to state a claim, which the court granted with respect to the federal FMLA claim over which it had jurisdiction, while declining to exercise continuing supplemental jurisdiction over the remaining state-law claims.  *See id.* at *9.  The court held that making secret recordings of workplace conversations and defying discovery obligations to timely produce such recordings were not protected activities within the meaning of the FMLA provision.

On June 19, 2023, Mr. Gates filed his Complaint in this case.  The Complaint included the following eight claims, each pled against all Defendants:
(1) first and third party retaliation in violation of FEPA (Count One);
(2) first and third party retaliation in violation of the WCA (Count Two);
(3) invasion of privacy (Count Three);
(4) intentional infliction of emotional distress (Count Four);
(5) breach of an implied employment contract (Count Five);
(6) promissory estoppel (Count Six);
(7) negligent hiring, supervision and retention (Count Seven); and
(8) aiding and abetting (Count Eight).
In a filing dated December 5, 2023, Mr. Gates withdrew Counts Five and Seven.

Analysis

The initial issue is whether, for each claim in the six remaining counts of his Complaint, Mr. Gates has pled a viable legal cause of action. As to claims determined to be viable, the issue is then whether Defendants have shown that the claim is precluded by the relevant statute of limitations.

## Counts One and Two: Retaliation In Violation of FEPA and the WCA

Both Counts One and Two assert first and third party retaliation claims pursuant to FEPA and the WCA, in which Mr. Gates makes claims for retaliation predicated on his own protected oppositional activities, as well as claims predicated on protected oppositional activities performed by his wife.

Legal Standards For Retaliation Claims Under FEPA and the WCA

*FEPA: Fair Employment Practices Act*

The provision within FEPA prohibiting retaliation provides, in pertinent part:

An employer . . . shall not discharge or in any other manner discriminate against any employee because the employee . . .
(A) has opposed any act or practice that is prohibited under this chapter[.]

21 V.S.A. § 495(a)(8)(A).[5]

A prima facie case under this provision requires allegations of fact related to the following four elements: (1) the employee engaged in a protected activity by opposing an employment act or practice that is prohibited under FEPA; (2) his employer was aware of the protected activity; (3) he suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action. *See Hammond v. Univ. of Vt. Med. Ctr.*, 2023 VT 31, ¶ 38, 304 A.3d 421; *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 42, 176 Vt. 356; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1974) (outlining prima facie elements for a discrimination claim under Title VII of the Civil Rights Act of 1964).

---

[5] Prohibited acts or practices are set forth in 21 V.S.A. § 495(a) and focus on prohibiting harassment and discrimination on specified grounds, one of which is disability. Subdivisions (B) through (E) of 21 V.S.A. § 495(a)(8) list several other types of protected activities or circumstances (other than opposing a prohibited act or practice) for which the employer is barred from discharging or in any other manner discriminating against the employee. Mr. Gates does not assert that his own actions, or those of his wife, constitute those other types of protected activities described in subdivisions (B) through (E) of § 495(a)(8).

*WCA: Workers' Compensation Act*

The WCA provides, in a pertinent section, that "[t]he provisions against retaliation in subdivision 495(a)(8) of this title and the penalty and enforcement provisions of section 495b of this title shall apply to this subchapter." 21 V.S.A. § 710(f). Thus, a prima facie case under the WCA provision requires the same elements as under the FEPA, except that a plaintiff asserting a WCA claim based on opposing a protected activity must show that he or she opposed an employment act or practice that is unlawful under the WCA (chapter 9 of title 21 of the Vermont Statutes, 21 V.S.A. §§ 601-711).[6]

*First and Third Party Claims*

Mr. Gates alleges several "first party" retaliation claims, alleging that his employer retaliated against him directly and personally because he himself engaged in protected activities. He also asserts so-called "third-party" retaliation claims, *i.e.,* that his employer retaliated against him because his wife, also an employee of Mack Molding, engaged in protected activities. He relies on *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011), a decision recognizing third party retaliation claims under Title VII, to argue that FEPA and the WCA authorize him to assert such claims. Defendants dispute that theory, arguing that the Vermont Supreme Court has never recognized third party retaliation claims under FEPA or the WCA.

*Sufficiency of Pleading of Retaliation Claims Under FEPA and the WCA*

In analyzing discrimination and retaliation claims based on circumstantial evidence under FEPA and the WCA at the summary judgment stage and at trial, the Vermont Supreme Court follows the burden-shifting analytical framework recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1974). *See Hammond*, 2023 VT 31, ¶ 25; *Gauthier v. Keurig Green Mtn., Inc.*, 2015 VT 108, ¶ 15, 200 Vt. 125. That framework requires the plaintiff to initially prove, by a preponderance of the evidence, the four essential elements described above. The burden-shifting framework of *McDonnell Douglas* then comes into play. It "is an evidentiary standard, not a pleading requirement," and thus is applied only on summary judgment or at trial. *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002). In order to survive a motion to dismiss, only notice pleading on the four essential elements is required. *Id.* at 511.

Accordingly, to sufficiently plead a first party FEPA or WCA retaliation claim, Mr. Gates must allege that Defendants took an adverse employment action against him because he opposed any act or practice by Defendants that is unlawful under FEPA or the WCA. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (stating identical pleading standard for Title VII retaliation claims, with the exception that under the federal rules, the allegations must be "plausible"); *see also Vt. Hard Cider Co., LLC v. Ciolek*, No. 2:11—CV—00150, 2012 WL 761304, *3 (D. Vt. Mar. 7, 2012) (under Title VII "one element of a prima facie case that is always necessary to a finding of liability is participation in a protected activity," which therefore must be pleaded, regardless of *Swierkiewicz*). Similarly, Mr. Gates' third-party

---

[6] Unlawful discriminatory practices are set forth in 21 V.S.A. § 710.

claims under FEPA and the WCA must allege that he suffered adverse employment actions because his wife opposed, as unlawful under FEPA or the WCA, an act or practice of Mack Molding or its agents.

To the extent a plaintiff asserts "conclusory allegations or legal conclusions masquerading as factual conclusions," the court is not required to accept them as true. *Rodrigue v. Illuzzi*, 2022 VT 9, ¶ 33, 216 Vt. 308 (quotation omitted). Thus, for example, rather than merely alleging phrases like "protected oppositional activity" or "materially adverse action," Mr. Gates must allege facts that are sufficient to give fair notice as to what allegedly constituted the claimed oppositional activity or adverse action. *See* Reporter's Notes, V.R.C.P. 8 (plaintiff must give a factual statement "clear enough to give the defendant fair notice of what the plaintiff's claim is *and* the grounds on which it rests") (emphasis added); *Vitale v. Bellows Falls Union High Sch.*, 2023 VT 15, ¶ 28, 293 A.3d 309. When those alleged factual grounds, together with all reasonable supporting inferences, fail to show that the plaintiff is entitled to relief, the plaintiff has failed to "allege a legally cognizable claim," and "dismissal is appropriate." *Montague v. Hundred Acre Homestead, LLC*, 2019 VT 16, ¶ 11, 209 Vt. 514.

Therefore, to sufficiently plead a "protected oppositional activity," Mr. Gates must allege facts showing that he or his wife took action to protest, or to complain, argue, contend, or make statements against activities or practices of Defendants that are unlawful under the FEPA or the WCA. *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (describing protected oppositional activities for purposes of Title VII); *Gates*, 2023 WL 4181945, at *6 (describing protected oppositional activities for purposes of the FMLA, citing *Crawford* and dictionary definition of "oppose"); *Beckmann v. Edson Hill Manor, Inc.*, 171 Vt. 607, 608 (2000) (mem.) (reporting alleged sexual harassment to supervisor was protected activity for purposes of FEPA retaliation claim).

To sufficiently plead that he suffered a "materially adverse employment action," Mr. Gates must allege that Defendants took an action that harmed his interests in such a manner that it "could well dissuade a reasonable worker" in his position from "making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006). An employer's failure to take action to try to address or correct complained-of unlawful acts or practices does not itself constitute an actionable adverse employment action. *See Hongmian Gong v. City Univ. of N.Y.*, No. 18 Civ. 3027 (LGS), 2019 WL 952340, *8 (S.D.N.Y. Feb. 27, 2019) ("[T]he failure to correct the complained-of discrimination is not a retaliatory action under Title VII." (citing *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) and *Kelly v. N.Y. State Ofc. of Mental Health*, 200 F. Supp. 3d 378, 404-05 (E.D.N.Y. 2016)). For purposes of his third party claims, Mr. Gates must allege that he suffered an action that adversely affected his interests in such a way that it could well have dissuaded a reasonable person in his wife's position from engaging in a protected activity in the first place. *See Lesiv*, 39 F.4th at 903, 916-18 (7ᵗʰ Cir. 2022).

As for causation, allegations of "temporal proximity, often no more than a few months, between the protected activity and the adverse action may suffice" for purposes of surviving a motion to dismiss. *Castro v. Yale Univ.*, 518 F. Supp. 3d 593, 611 (D. Conn. 2021) (citing *Vega*, 801 F.3d at 90); *see Robertson*, 2004 VT 15, ¶ 47 (gap of nearly seven months insufficient to

satisfy causation element of prima facie case under FEPA); *Gates*, 2023 WL 418945, *7 (noting that while there is no "bright line" rule, "'most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference'" (quoting *De Figuerora v. New York*, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019)); *Raymond v. City of New York*, 317 F. Supp. 3d 746, 774 (S.D.N.Y. 2018) (same). Assertions of protected oppositional activities taken *after* a putative adverse action are legally insufficient to prove causation for purposes of a FEPA or WCA retaliation claim. *See Hammond*, 2023 VT 31, ¶ 39 ("The verbal warning [issued to plaintiff] . . . cannot be viewed as retaliatory, since it occurred before plaintiff engaged in any protected activity.").

A plaintiff may also sufficiently plead causation by alleging direct evidence of improper motive. Statements or other conduct by decisionmakers, or by others with "enormous influence in the decision-making process" that directly reveal those actors' retaliatory motives or intent when taking adverse actions may suffice. *Gates*, 2023 WL 418945, *7 (omitting internal quotation marks); *see Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 149 (2d Cir. 2024) (observing that while "many discrimination claims depend on proof by circumstantial evidence," "statements or actions by the employer's decisionmakers . . . that may be viewed as directly reflecting the alleged discriminatory attitude constitute the proverbial smoking gun" (omitting internal quotation marks and added emphasis)).

*Special Legal Issues related to Third Party Claims*

Mr. Gates' assertions of third party claims present two legal issues not previously decided by the Vermont Supreme Court. The first is whether the identical anti-retaliation provisions of FEPA and the WCA, cited above, make it unlawful for an employer to take a materially adverse employment action against an employee because the spouse of such employee, rather than the employee himself or herself, initially opposed an act or practice by the same employer. The second is whether a separate WCA provision, 21 V.S.A. § 710(b), which makes it unlawful to retaliate against an employee for having sought workers' compensation benefits, also makes it unlawful to retaliate against that employee's spouse. These two issues are addressed here prior to analysis of the sufficiency of the claims asserted by Mr. Gates.

1. Retaliation Claims Based on Oppositional Activities by One's Spouse

*Thompson v. North American Stainless, L.P.*, 562 U.S. 170 (2011), provides persuasive guidance with regard to the proper construction of the FEPA and WCA identical anti-retaliation provisions on this issue. In *Thompson*, the plaintiff and his fiancé shared the same employer, and plaintiff was fired three weeks after the employer learned that plaintiff's fiancé had filed a formal sex discrimination charge against the employer. Relying heavily on statutory analysis from a prior Title VII decision, *Burlington Northern and Santa Fe Railway Company v. White*, 548 U.S. 53 (2006), the *Thompson* Court had "little difficulty" in concluding that plaintiff's firing constituted unlawful retaliation under Title VII. *Thompson*, 562 U.S. at 173-74.[7] In *Burlington*

---

[7] The Vermont Supreme Court has regularly recognized that FEPA "'is patterned on Title VII of the Civil Rights Act of 1964, and the standards and burdens of proof under FEPA are identical to those under Title VII.'" *Hammond*, 2023 VT 31, ¶ 24 (quoting *Hodgdon v. Mt. Mansfield Co., Inc.*, 160 Vt. 150, 161 (1992)); *see Gallipo v.*

*Northern*, the Court addressed whether an actionable adverse employment action, for purposes of a Title VII retaliation claim, included acts by an employer other than those that adversely affected the terms and conditions of one's own employment. As summarized later in *Thompson*, the *Burlington Northern* Court wrote:

> held that Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct. We reached that conclusion by contrasting the text of Title VII's antiretaliation provision with its substantive antidiscrimination provision. Title VII prohibits discrimination on the basis of race, color, religion, sex, and national origin "'with respect to . . . compensation[,] terms, conditions, or privileges of employment,'" and discriminatory practices that would "'deprive any individual of employment opportunities or otherwise adversely affect his status as an employee.'" *Burlington Northern*, 548 U.S. at 62 (quoting 42 U.S.C. § 2000e-2(a)). In contrast, Title VII's antiretaliation provision prohibits an employer from "'discriminat[ing] against any of his employees'" for engaging in protected conduct, without specifying the employer acts that are prohibited. *Id.* (quoting (42 U.S.C. § 2000e-3(a)). Based on this textual distinction and [the *Burlington Northern* Court's] understanding of the antiretaliation provision's purpose, [the Court] held that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. Rather, Title VII's antiretaliation provision prohibits any employer action that might "well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68.

*Thompson*, 562 U.S. at 173-74. Based on this analysis, the *Thompson* Court found it a short step to conclude that materially adverse actions against an employee's spouse or close family member, taken by an employer in retaliation for the employee's protected activities, was an unlawful action as well:

> [W]e adopted a broad standard [for adverse employment actions] in *Burlington* because Title VII's antiretaliation provision is worded broadly. We think there is no textual basis for making an exception to it for third-party reprisals, and a preference for clear rules cannot justify departing from statutory text.

*Id.* at 175.

Also at issue in *Thompson* was whether the plaintiff, though unquestionably harmed by his firing, had a right to sue his former employer under Title VII. *Id.* The Court found that such right existed under Title VII's private enforcement provision, 42 U.S.C. § 2000e-5(f)(1), which provides that "a civil action may be brought . . . by the person claiming to be aggrieved." *See* 562 U.S. at 175-78. Such language, the Court reasoned, "enable[ed] suit by any plaintiff with an interest arguably sought to be protected by the state, while excluding plaintiffs . . . whose

---

*City of Rutland*, 2005 VT 83, ¶ 15, 178 Vt. 244 (same). Thus, the construction of FEPA by Vermont courts "is often guided by the federal courts' interpretations of Title VII." *Payne v. U.S. Airways, Inc.*, 2009 VT 90, ¶ 10, 186 Vt. 458 (citing *Lavalley v. E.B. & A.C. Whiting Co.*, 166 Vt. 205, 209 (1997)).

interests are unrelated to the statutory prohibitions in Title VII." *Id*. at 178 (omitting internal citations, alterations, and quotation marks). The plaintiff in *Thompson* fit that bill, because he "was an employee," "the purpose of Title VII is to protect employees from their employers' unlawful actions," and "[h]urting him was the unlawful act by which the employer punished [plaintiff's fiancé]." *Id*.

Accordingly, under *Thompson*, a plaintiff may bring a Title VII retaliation claim where an employer's adverse action is taken against him because the plaintiff's spouse or other close family member has engaged in a protected activity, and the plaintiff's interests are harmed in such a way or degree that it might well have dissuaded a "reasonable worker" in the position of plaintiff's spouse or other close family member from engaging in that activity in the first place. *See id*. at 174 ("We think it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired."); *id*. at 175 ("We expect that firing a close family member will almost always meet the *Burlington* standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so, but beyond that we are reluctant to generalize."); *see also Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 916-18 (7th Cir. 2022) (applying the *Thompson* standard).

This case is brought under FEPA rather than Title VII but FEPA's anti-retaliation provision, while not identical to Title VII's anti-retaliation provision, contains broad language that supports making it unlawful for an employer to take materially adverse retaliatory actions against a spouse or other close family member of an employee who engaged in a protected activity. FEPA's anti-retaliation provision provides that an employer "shall not discharge or in *any other manner* discriminate against any employee because the employee . . . has opposed any act or practice that is prohibited under this chapter[.]" 21 V.S.A. § 495(a)(8)(A) (emphasis added). Such terms prohibit retaliatory actions at least as broadly as does Title VII's antiretaliation provision. *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to *discriminate against* any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." (emphasis added)).

Moreover, the Vermont Supreme Court resolves reasonable doubts under FEPA liberally, in a manner consistent with the statute's "remedial purpose." *Payne*, 2009 VT 90, ¶ 21; *see also* 3 S. Singer, *Sutherland Statutory Construction* § 60:1 (8th ed., Nov. 2023 update) ("Courts liberally, or broadly, construe remedial statutes in order to help remedy the defects in the law that prompted their enactment."); *cf. Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 409 (4th Cir. 2015) ("Title VII should be liberally construed in light of its remedial purpose."). Similarly, the Court "commonly applie[s]" a "liberal constru[ction]" of workers' compensation statutes "in favor of employees." *Smith v. Desautels*, 2008 VT 17, ¶ 17, 183 Vt. 255 (citing *Butler v. Huttig Bldg. Prods.*, 2003 VT 48, ¶ 12, 175 Vt. 323 and 3B N. Singer, *Statutes and Statutory Construction* § 75:3, at 32 (6th ed. 2003 rev.)).

Although Defendants cite numerous federal cases regarding Title VII in support of various other arguments and points of law regarding the meaning and application of FEPA and

the WCA,[8] Defendants cite no federal decisions to dispute Mr. Gates' third-party theory, and merely note that the Vermont Supreme Court has never recognized such a theory.[9]

FEPA's private enforcement provision, similar to Title VII's private enforcement provision, permits "[a]ny person aggrieved by a violation of the provisions of this subchapter" to bring a private action for relief. 21 V.S.A. § 495b(b). Consistent with the reasoning in *Thompson*, *see* 562 U.S. at 175-78, such language permits an employee like Mr. Gates, who allegedly suffered injuries because of the actions taken by his employer that were intended as retribution against his spouse for engaging in a protected activity, to bring a third-party retaliation claim under FEPA.

Thus, Mr. Gates may assert third party retaliation claims under the anti-retaliation provisions of FEPA and the WCA.

2.  Claim for Third-Party Retaliation Under the WCA Based on a Spouse's Claim for Workers' Compensation Benefits

Mr. Gates asserts a third party claim for retaliation that is predicated on his wife's effort to obtain workers' compensation benefits. Subsection (b) of 21 V.S.A § 710 reads as follows:

> No person shall discharge or discriminate against an employee *from employment* because such employee asserted or attempted to assert a claim for benefits under this chapter or under the law of any state or under the United States.

21 V.S.A § 710(b) (emphasis added). The terms "from employment," modify and limit the scope of the preceding terms, "discharge or discriminate against an employee." The modifying terms indicate that the interests protected by the provision are those arising *from* the terms, conditions or privileges of employment. The provision thus does not indicate that "discriminate against" carries a broad meaning that would cover adverse actions that do not affect terms or conditions of employment of the employee who sought benefits under the WCA.

---

[8] Along with citing many other Title VII cases, Defendants favorably cite *Burlington Northern* itself (albeit, to emphasize just how harmful or injurious an act of discriminatory retaliation must be in order to be actionable). *See* Defs.' Mot. to Dismiss (filed Aug. 28, 2023), at 28-29 (arguing that "empty verbal threats" of adverse actions and "'personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable'" employer actions for purposes of a FEPA or WCA retaliation claims (quoting *Burlington Northern*, 548 U.S. at 68)).

[9] Defendants raise a challenge to the third-party retaliation theory based on the outcome of his wife's suit: that because Ms. Gates' discrimination and retaliation claims were fully and finally adjudicated in Defendants' favor, Mr. Gates lacks a basis to assert any third party claim. However, the applicable statutes prohibit acts of discrimination against an employee that are taken because the employee has made a complaint or allegation that the employer has engaged in unlawful acts or practices. An employer is not free to retaliate against the complaining employee except in instances where the employee's complaints are found to have merit, or where the complaints ultimately result in some ameliorative or redressive impacts. *Cf. also* 21 V.S.A. § 495(a)(8)(E) (prohibiting any manner of discrimination against any employee "because the employee is *believed* by the employer to have" opposed any act or practice that is prohibited under FEPA)(emphasis added).

This reading finds support in legislative history. Section 710(b) has remained materially the same since it was enacted in 1985. Thus, when the Legislature added 21 V.S.A § 710(f) to the WCA in 2013, with its much broader definition of discrimination ("discharge or in *any other manner* discriminate against any employee") (emphasis added), the Legislature did not similarly expand the scope of "discriminate against" as found in 21 V.S.A § 710(b). *See* 2013, Act. No. 31, § 9 (adding 21 V.S.A § 710(f), and amending 21 V.S.A § 710(b) only by inserting "or attempt to assert" preceding "a claim for benefits"). The Legislature's failure to broaden the scope of "discriminate against" in 21 V.S.A § 710(b), even while adding 21 V.S.A § 710(f), suggests that § 710 is intentionally more narrow.

Furthermore, a third party retaliation claim predicated on a spouse asserting a claim for legal benefits is not suggested by *Thompson*, which concerned an adverse action taken because the plaintiff's fiancé made a charge of sex discrimination, not because she sought legal benefits. Thus, there is no basis to construe the statute for the benefit of Mr. Gates based on his wife's assertion of a workers' compensation claim. Therefore, Mr. Gates does not have a legal basis to pursue such a claim.

*Application of Pleading Standards to Plaintiff's Claims of First and Third Party Retaliation*

Mr. Gates alleges actionable retaliation based on a number of different incidents. After Defendants' Motion to Dismiss had been briefed by both sides, the court held a hearing and requested that Mr. Gates provide a supplemental outline of the elements and facts related to each of the numerous claims to aid in the evaluation of the sufficiency of pleading for each claim. The following analysis relies heavily on Mr. Gates' supplemental "Outline of his Claims" while taking into account Defendant's response as well as the parties' briefs on the Motion to Dismiss. First party claims are addressed first, followed by third party claims.

First Party Retaliation Claims Predicated on Mr. Gates' Own Alleged Protected Activities

1. *Claim Based on Mr. Gates' Complaint of False Accusations of Causing Chemical Spills*
Mr. Gates alleges that on two occasions between late May of 2016 and late October of 2017, two employees falsely accused him of causing a chemical spill in the workplace, and that despite his denials, Supervisor Kevin Peets issued disciplinary notices against him. His first party retaliation claim is predicated on verbal *complaints* that he made about this to Supervisor Peets, initially before the first disciplinary write-up, and again later. Mr. Gates alleges that he suffered adverse employment action in that his complaints were ignored and the write-ups became part of his record and could lead to firing if repeated. He also complained that they interfered with his ability to help other workers.[10]

Complaining to a supervisor about being falsely accused of a workplace infraction is not a "protected oppositional activity." It does not oppose an act or practice prohibited under FEPA or the WCA, and does not fall within any of the other activities or categories identified in 21

---

[10] The allegations in the Complaint and in Plaintiff's subsequent "Outline of Claims" differ slightly. The court relies on the allegations in the Complaint.

V.S.A. §§ 495(a)(8)(B)-(F). Thus, the Motion to Dismiss is granted as to a claim of first party retaliation related to Mr. Gates' complaints of false accusations and unfounded written discipline related to two chemical spills.

2. *Claim of Retaliation Based on Mr. Gates' November 2017 Complaint That His Job Reassignment Was Retaliatory*

Mr. Gates alleges that he was retaliated against in November of 2017 because he complained to his supervisors that he had suffered retaliatory acts motivated by his wife's civil lawsuit. (See below for analysis of the claim of third party retaliation based on his wife's lawsuit.)  Specifically, he alleges that after he was reassigned to the die-setting job (which he claims as the basis for third party retaliation as set forth below), he made a *complaint* to Defendant Ceflo that the reassignment to the die-setting job was unlawful retaliation.  He alleges that following such complaint, he suffered adverse actions, manifested by his employer ignoring his complaint and not entirely relieving him of the obligation to perform at least a share of the die setting job duties.

The alleged facts show that soon after his complaint, he was permitted to retain his old job in the finishing department, and he did not lose pay or seniority. Mr. Gates has not alleged that he suffered material adverse action as a result of this complaint because his "situation in the wake of [his] having made the complaint is the same as it would have been had [he] not brought the complaint or had the complaint been investigated but denied for good reason or for none at all." *Fincher v. Depository Trust & Clearing Corp.,* 604 F. 3d 712, 721 (2d Cir. 2010); *see Hongmian*, 2019 WL 952340, *8 ("[T]he failure to correct the complained-of discrimination is not a retaliatory action under Title VII.").

Therefore, the Motion to Dismiss is granted as to the claim of first party retaliation that is predicated on Mr. Gates' November 2017 complaint of unlawful retaliation.

3. *Claim of Retaliation Based on Complaint Mr. Gates made in January 2019 of Unlawful Retaliation in the Form of Being under Close Scrutiny*

During a meeting on January 8, 2019 with Defendants Jessica Fredette and Bud Pagliccia, Mr. Gates complained that their decision made a few days prior to more closely monitor and scrutinize his work under the eye of a new supervisor (Mr. Scheiner), was unlawful retaliation for his wife's civil suit.  Mr. Gates argues that, because of his complaints at that meeting, he was immediately subjected to adverse actions that included denials of retaliatory motives, threats of insubordination if he did not go along with their earlier decision, and a statement that he was "creating a negative work environment."

Mr. Gates has not sufficiently alleged material adverse employment action harmful to his employment interests. The issue is not whether he was put off, told he was wrong, or told that his complaints were counterproductive or negative.  Statements to an employee that his complaints are creating a negative work environment may be unpleasant but do not constitute harm to employment interests. Mr. Gates has not alleged that after having made this complaint, his situation was made still worse than it was at the time he voiced the complaint. He has not alleged an adverse *change* in his position stemming from his complaint. As such, his complaint cannot

have caused or resulted in any material adverse impact on him. There is no allegation that the threat of insubordination was followed by any further action. The threat was not an action with an alleged adverse impact.

Thus, the Motion to Dismiss is granted as to the claim of first-party retaliation that is predicated on Mr. Gates' complaint, lodged in January of 2019, that increased scrutiny and monitoring of his work was unlawful retaliation.

4. *Claim of Retaliatory Suspension and Discharge in May of 2019 for Having Made Secret Audio Recordings of Workplace Conversations*

Mr. Gates alleges that on May 6 and 11, 2019 he was suspended and then terminated in retaliation for having made over a dozen secret audio recordings of workplace conversations in the months prior.[11] As ruled by the court in Gates' federal lawsuit, making secret recordings of workplace conversations with one's supervisors or co-workers does not constitute protected oppositional activity. *See Gates*, 2023 WL 4181945, at *6. Indeed, the pertinent language of the federal FMLA anti-retaliation provision (29 U.S.C. § 2615(a)(2)) closely tracks that of FEPA and the WCA.

Thus, the Motion to Dismiss is granted as to the claim of first party retaliation based on the making of secret audio recordings in the workplace.

Third Party Claims of Adverse Employment Action Based on Mr. Gates' Wife's Actions

1. *Retaliation Claim Predicated on Mr. Gates' Wife's Request in May 2016 For Reasonable Workplace Accommodation and/or Her Application For Workers' Compensation Benefits*

In May of 2016, Ms. Gates sought a reasonable workplace accommodation for a claimed disability or workplace injury, and then filed a claim for workers' compensation benefits. Neither of those actions constitute opposition to an act or practice prohibited by either FEPA or the WCA. In addition, for reasons noted above, while it is unlawful under the WCA for an employer to take adverse action against an employee for having sought benefits under the WCA, the statute does not extend to supporting a cause of action for the spouse of the employee.

Thus, the Motion to Dismiss is granted as to the claim of third party retaliation that is based on Mr. Gates' wife's request for reasonable accommodation, and/or her pursuit of workers' compensation benefits.

2. *Retaliation Claim Based on Mr. Gates' Reassignment to the Die Setting Job after his Wife filed her Civil Suit in October of 2017*

Mr. Gates alleges that almost immediately after his wife's civil suit was filed in late October of 2017, he suffered an adverse action by his re-assignment to a new and dangerous position in another department as a die setter for which he had no experience, with no other option except to seek another position with less pay and seniority. In her suit, his wife claimed

---

[11] He alleges adverse actions for other reasons in May of 2019 which are addressed elsewhere in this decision.

discrimination based on refusal to acknowledge and accommodate a disability on her part, and she also claimed that she suffered retaliation for having sought worker's compensation benefits. Thus the allegations constituted opposition to actions she alleged were protected activities under the statutes.

Mr. Gates alleges that the die setting assignment had adverse impacts on him and could well have convinced a reasonable person in his wife's position not to file her legal claims if she had known that would occur. He alleges that for a person without prior experience or training, die setting was dangerous work, or certainly more dangerous for him than was his long-held position in the finishing department. The legitimacy of the allegation that the die setting job was dangerous is supported by his allegation that his supervisors, upon hearing Mr. Gates' safety concerns, assigned an experienced tech to work alongside Mr. Gates when die setting. He also alleges that other employees, including the head of human resources, acknowledged that Mr. Gates' lacked prior qualifications for die setting work. He further alleges that a new outside hire, similarly lacking in experience or training in die setting work, was afforded significant training opportunities before he was tasked to handle die setting duties, suggesting that Mr. Gates was treated differently than those with a comparable or similar lack of experience and training. Moreover, the die setting job increased the overall workload and/or demands on Mr. Gates' time.

Although by mid-November of 2017 Defendants announced their decision to assign another worker to share or split the die setting duties with Mr. Gates, he alleges that he was never fully relieved of the die setting job assignment. Given that he also maintained his prior job position in the finishing department, even the "split" or shared die setting job assignment arguably constituted an increase in Mr. Gates' workload. The change was not accompanied by any increase in pay or any other benefits.

Defendants argue that material adversity and causation have not been sufficiently alleged since Mr. Gates admits that, within roughly two weeks after he was tasked with die setting, his supervisors announced that he would share the assignment with a co-worker, and that Mr. Rogstadt, a supervisor who was undisputedly not motivated by retaliatory animus, would be in charge of deciding each day which of the two workers would perform the assignment. These facts are insufficient to counteract a reasonable inference of retaliation, which the alleged facts support and is all that is needed to survive a motion to dismiss. The timing of these events permits the reasonable inference that the decision adversely affecting Mr. Gates was made because of his wife's lawsuit, and that the decision to involve Mr. Rogstadt was merely post-hoc effort to mitigate the impacts and/or mitigate appearances. Mr. Gates also alleges that the sharing of the die setting assignment did not take the job duties completely away from him and that he was required to continue to perform that shared assignment throughout the remainder of his employment.

Defendants argue that any inference of causation that is shown by the temporal proximity is fully rebutted or ameliorated by Defendants' actions taken roughly two weeks later after the initial decision to assign Mr. Gates to the die-setting job. That argument essentially asks the court to become a fact-finder on the central issues of unlawful motive and causation. It is not the court's role when evaluating sufficiency of allegations in response to a motion to dismiss to

evaluate the weight of the evidence or make a finding as to Defendants' motives.  Mr. Gates has made factual allegations sufficient to withstand dismissal for failure to state a claim.

Defendants' Motion to Dismiss is denied as to the claim of third party retaliation that is based on the decision to assign Mr. Gates the die setting job shortly after his wife filed her civil action.

***Summary of Counts One and Two***:  Mr. Gates has pled a single viable claim for retaliation based on his having been reassigned to the die setting job in November of 2017 immediately after his wife filed her civil suit against Mack Molding claiming disability discrimination.

*The Statute of Limitations Defense*

Defendants assert the affirmative defense of statute of limitations pursuant to V.R.C.P. 8(c). At the pleading stage Defendants may meet their burden only by reliance on factual allegations that appear on the face of the Complaint or facts of which the court takes judicial notice.  *See Gates*, 2023 WL 4181945, *4; *DaimlerChrysler Servs. of N. Am., LLC v. Ouimette*, 2003 VT 47, ¶ 5, 175 Vt. 316.

The claim for retaliation accrued in November of 2017.  Mr. Gates filed this case on June 19, 2023.  The parties dispute which statute of limitations governs a FEPA retaliation claim.  Mr. Gates argues for application of 12 V.S.A. § 525, which became effective on May 31, 2022, and provides for a six-year limitation period.  *See* 2021, Act. No. 147 (Adj. Sess.), § 39 ("An action under . . . 21 V.S.A. § 495b (employment discrimination) shall be commenced within six years after the cause of action accrues and not after."). Defendants point out that Mr. Gates' FEPA claim accrued before May 31, 2022, noting that it was filed initially in federal court on May 6, 2022, and argue that the applicable statute of limitations for a claim is the one in effect at the time of the claim's accrual, not the one in effect later.  *See Stewart v. Darrow*, 141 Vt. 248, 253 (1982) (only the statute of limitations that was in effect at the time that the claim accrued controls).  The only exception would be where the legislation enacting the limitations period for a particular claim expressly indicates that the enactment applies retroactively, to claims that had accrued prior to the enactment's effective date.  *See A.B. v. S.U.*, 2023 VT 32, ¶ 21, 298 A.3d 573 ("Laws are generally prospective and legislative acts must unequivocally express an intent to have retroactive application." (omitting internal quotation marks; citing, *inter alia*, 1 V.S.A. § 214)).  The 2022 enactment here contains no such express retroactivity provision, so it does not control.

Thus, FEPA claims that accrued prior to the effective date of the 2022 enactment are governed by either 12 V.S.A. § 512(4) or 12 V.S.A. § 511.  *See Egri v. U.S. Airways*, 174 Vt. 443, 445 (2002) (mem.) (addressing statutes of limitations regarding FEPA claims).  Section 512(4) provides that civil actions for "injuries to the person" must be commenced within three years of the date of accrual, while § 511, the "'catchall statute,'" bars other civil actions generally, unless they are filed within six years from their accrual date.  *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 455 (2000) (quoting *Fitzgerald v. Congleton*, 155 Vt. 283, 287 (1990)).  Mr. Gates alleges that he suffered both personal injuries and economic injuries as a result of

Defendants' violations of FEPA's antiretaliation provision. *See* Compl. ¶¶ 280, 305. Accordingly, his claim is covered by both § 512(4) and § 511: "[W]here a complaint clearly alleges injury covered by § 512 and injury covered by § 511, the two different limitation periods apply, even though there is only one wrongful act." *Egri*, 174 Vt. at 445; *see also id*. at 444 ("'it is the nature of the harm done, rather than the plaintiff's characterization of the cause of action, that determines which statute of limitation governs.'" (quoting *Bull*, 170 Vt. at 455)).

The specific date or time of the accrual of claims governed by § 512(4) or § 511is determined by the "discovery rule." *Gettis v. Green Mtn. Econ. Dev. Corp.*, ¶ 22, 179 Vt. 117 ("In personal injury claims governed by 12 V.S.A. § 512(4), the cause of action accrues at the time a plaintiff discovers or reasonably should have discovered the basic elements of a cause of action, including the existence of any injury and its causes."); *Bull*, 170 Vt. at 456 ("cause of action governed by § 511 accrues when plaintiff discovers, or through reasonable diligence should have discovered, injury" (citing *Univ. of Vt. v. W.R. Grace & Co.*, 152 Vt. 287, 290-91 (1989)).

Mr. Gates seeks an exception to the discovery rule under the "continuous tort" or "continuing violation" doctrine. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss (filed Sept. 27, 2023), at 19; Compl. ¶¶ 286, 297-30, 307, 315-18 (alleging "continuous retaliatory harassment and retaliation" in violation of FEPA and the WCA). Under that doctrine, a plaintiff may "'support his or her cause of action with events that occurred outside'" (prior to) an applicable limitations period, "'by delaying the date of accrual of the tort claim until the date of the last injury or the last date on which tortious acts cease.'" *Nesti v. Vt. Agency of Transp.*, 2023 VT 1, ¶ 37, 296 A.3d 729 (quoting *Gettis*, 2005 VT 117, ¶ 23). Mr. Gates alleges that after his wife filed her civil action in October, 2017, he endured continuous retaliation, by and through Defendants' decision to assign him the die setting job, an assignment that continued throughout his entire remaining tenure at Mack Molding.

However, these allegations are insufficient to trigger the continuing violation doctrine, for the reason explained by the Vermont Supreme Court in *Gettis*:

> The continuing tort doctrine requires that a tortious act—not simply the continuing ill effects of prior tortious acts—fall within the limitation period. The necessary tortious act cannot be the failure to right a wrong committed outside the limitation period. If it were, the tort in many cases would never accrue because the defendant could undo all or part of the harm.

*Gettis*, 2005 VT 117, ¶ 28 (citing, *inter alia*, *Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999) ("a continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act" and "[n]or can an otherwise barred claim be rendered timely by the mere continuation of the claimant's employment")).

Moreover, in *National Railroad Passenger Corp. v. Morgan*, the U.S. Supreme Court held that for purposes of Title VII, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." 536 U.S. 101, 113 (2002). And thus, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that

18

act." *Id*.; *see also id*. at 110-11 (holding that the statutory term "practice" refers to "a discrete act or single 'occurrence,'" and that a "discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened'"). The Court also expressly listed "termination, failure to promote, denial of transfer [and] refusal to hire" as examples of such discrete acts, each of which starts a new clock and limitations period in which to file charges. *Id*. at 114 ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'")

The *Morgan* Court then went on to distinguish claims arising from an employer's distinct adverse acts from claims of a hostile work environment, observing that for the latter, the wrongs are "continuing" in nature and typically based on repeated conduct, such that the "unlawful employment practice" cannot be said to occur on any particular day. *See id*. at 115-17 (observing that unlike discrete discriminatory or retaliatory actions, incidents that give rise to a hostile work environment claim "occur[] over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own"). Thus, the application of statutes of limitation to claims alleging a hostile work environment is analytically distinct: as long as a single act "contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability." *Id*. at 117. Accordingly, after *Morgan*, "claims based on discrete acts are timely only where such acts occurred within the limitations period, and . . . claims based on hostile environment are only timely where at least one act [contributing to the hostile environment] occurred within the limitations period." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279-90 (5th Cir. 2004).

*Morgan* bolsters the conclusion that the continuing violation doctrine does not apply with respect to Mr. Gates' viable retaliation claim in this case.[12] This is not a hostile work environment case, so the continuing violation doctrine does not affect the date of accrual of Mr. Gates' claim.

However, Mr. Gates also raises a separate legal issue: whether under 12 V.S.A. § 558, the operative or effective date of *filing* should be the date on which he filed his FEPA and WCA retaliation claims in federal court (May 6, 2022), rather than the date that such claims were filed in this case (June 19, 2023). That provision allows a plaintiff to "commence a new action for the same cause within one year after the determination of the original action, when the original action has been commenced within the time limited by any statute of this State, and the action has been determined for any of the following reasons: where the action is dismissed for lack of jurisdiction of the subject matter[.]" 12 V.S.A. § 558(a)(2). On March 23, 2023, the federal court declined to continue exercising supplemental jurisdiction over any of Mr. Gates' state law causes of action and dismissed them without prejudice. *See Gates*, 2023 WL 418945, *9. Thus, while the dismissal was discretionary, it was in essence a dismissal for lack of subject matter jurisdiction, thus triggering § 558(a)(2). *Cf. Leno v. Meunier*, 125 Vt. 30, 33 (1965) (noting that

---

[12] Mr. Gates notes that in *Lee v. University of Vermont*, 173 Vt. 626, 626-27 (2002) (mem.), the Vermont Supreme Court recognized that the continuing violation doctrine might apply so as to save FEPA discrimination claims that otherwise would have been untimely under 12 V.S.A. § 511, though the Court never squarely decided that the doctrine does apply to FEPA claims. *Morgan* was decided by the United States Supreme Court after *Lee* and may influence the outcome in a future case on the issue in Vermont.

it is "settled law" that 12 V.S.A. § 558 is "remedial" and "should be construed liberally"). Since the present action was commenced within one year after that dismissal, the statute applies, and makes the date of the federal filing the operative filing date in this case. Indeed, Defendants do not dispute the application of § 558(a)(2), and merely argue that even the federal filing date is too late to save any of Mr. Gates statutory retaliation or common law claims.

In sum, the one viable retaliation claim arising from the die setting assignment accrued no later than November of 2017, which leaves Mr. Gates with no timely-filed damages claim for his alleged personal injuries. A claim for economic injuries related to that claim is permitted by 12 V.S.A. § 558 and is not dismissed on statute of limitation grounds.


## Count Three: Invasion of Privacy

Mr. Gates alleges that he suffered tortious invasion of privacy as a result of the meeting on May 6, 2019, when Ms. Fredette and Mr. Pagliccia told him that he would be able to keep his job, so long as he divulged the substance of his communications with his attorney regarding his surreptitious audio recordings of workplace conversations. This meeting occurred immediately after Defendants had learned the full extent of Mr. Gates' recent recording activities, which included over a dozen secret audio recordings of recent workplace conversations.

Mr. Gates requested that he be allowed to consult with his attorney and proposed that he instead answer questions during a formal deposition. Mr. Gates alleges that Ms. Fredette and Mr. Pagliccia ignored and/or denied Mr. Gates' requests and insisted that if Mr. Gates was responsive to each of their questions, including those seeking the substance of his communications with his attorney, he would keep his job. Mr. Gates alleges that with his career at stake, he felt pressured to divulge his private communications with his attorney, and did so during that meeting to some extent and then stopped.

Mr. Gates is asserting an "intrusion upon seclusion" tort. The Restatement defines that tort claim as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Restatement (Second) of Torts* § 652B (1977).

The official comments to the *Restatement* provide clarification. An intrusion upon seclusion may be actionable if it takes the

> form of investigation or examination into [a person's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents. The intrusion itself makes the defendant

subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.

*Restatement (Second) of Torts* § 652B, cmt. b.  To clarify this point, the comments provide the following illustration:

A is seeking evidence for use in a civil action he is bringing against B.  He goes to the bank in which B has his personal account, exhibits a forged court order, and demands to be allowed to examine the bank's records of the account.  The bank submits to the order and permits him to do so.  A has invaded B's privacy. *Id*., cmt. b, illus. 4.

The Vermont Supreme Court has had several occasions to analyze whether various factual scenarios are sufficient to meet the requirements of an intrusion upon seclusion claim.

In 1990, the Court ruled that an employer's letter to an employee threatening termination of employment unless she returned to work wearing dentures was insufficient to state a cause of action. While "perhaps insensitive," there was no "substantial intrusion." *Hodgdon v. Mt. Mansfield Co., Inc.,* 160 Vt. 150, 162 (1992).

In 1994, the Court considered a claim in which a plaintiff claimed invasion of privacy when an employer made multiple inquiries to the employee who was on sick leave regarding the employee's personal health, visited the home during which the employer asked personal medical questions overheard by guests at a birthday party, and made repeated telephone calls to the employee's home. The court affirmed summary judgment to the defendant, ruling that while the employer's questions made in front of guests was "unusual and possibly rude," the actions were not substantial. It also concluded that they would not be "highly offensive to a reasonable person." *Denton v. Chittenden Bank,* 163 Vt. 62, 69 (1994).

In 2000, the Court ruled that where an employer "made inquiries of a personal nature and would lean close to [an employee] at her work station,. . .there was no 'substantial intrusion' upon her private affairs which would be 'highly offensive to a reasonable person.'" *Vermont Ins. Mgmt., Inc. v. Lumbermens' Mut. Cas. Co.,* 171 Vt. 601, 604 (2000) (quoting *Hodgdon)*.

In 2003, the Court affirmed recovery for invasion of privacy based on defendants' actions undertaken on plaintiff's property in cutting down trees, filling in a streambed, and accosting defendants and their guests such that plaintiff no longer went into her yard, as well as making false complaints to police and health inspectors who visited the plaintiffs' home two or three times a week. The Court concluded that these facts showed that defendants "substantially intruded on defendants' solitude and seclusion." *Pion v. Bean*, 2003 VT 79, ¶ 36, 176 Vt. 1.

In 2008, the Court upheld a $500,000 jury award for invasion of privacy where:

Defendant systematically terrorized plaintiffs' family by conduct that escalated from placing garbage and then sharp objects on plaintiffs' driveway, to monitoring plaintiffs' house by parking at early morning hours in their driveway, "keying" their car while parked at their home, placing harassing phone calls to their house, attempting identity theft, placing live bullets on plaintiffs' yard, poisoning the family dog, and vandalizing bird feeders placed close to their house. Defendant was undeterred by the presence of law enforcement; his behavior escalated even after his arrest. As such, plaintiffs are living as if under siege. They have installed a security system at their home and have armed themselves. They are constantly vigilant when defendant fires weapons on his property. They struggle to comfort their young daughter who has nightmares. We therefore uphold the jury's $500,000 compensatory-damages award; plaintiffs' sense of peace and privacy in their home has been destroyed by defendant.

*Shahi v. Madden*, 2008 VT 25, ¶ 24, 183 Vt. 320.

In 2015, the Court affirmed a grant of summary judgment denying recovery where the defendant had hollered obscenities while approaching with a very large dog, made threats of legal action, and forced plaintiff to incur legal costs. The Court concluded that the conduct was not "sufficiently substantial to satisfy the elements of this tort." *Weinstein v. Leonard*, 2015 VT 136, ¶ 28, 200 Vt. 615. The Court specifically cited *Restatement (Second) of Torts* § 652B, cmt. d. That comment states that "there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff that it becomes a substantial burden to his existence, that his privacy is invaded." The Court also specifically reviewed the factual scenarios and rulings in all of the cases cited above. *See* 2015 VT 136, ¶ 32.

These decisions, together with the Restatement examples, show that the element of 'invasion' is key. The cause of action requires that the defendant has taken some affirmative action to invade a plaintiff's personal space or body of private information. Posing questions about private matters, which need not be answered, does not appear to be enough. Moreover, the requirement that the invasion be "substantial" is a serious one. The required element of a 'substantial intrusion' provides a reasonable limitation against making actionable a wide variety of circumstances in which persons ask others questions about private matters.

Mr. Gates alleges that he had a 30-minute meeting with two superiors who asked him to reveal information about his communications with his attorney. He had the opportunity to simply decline to answer, which is what he did after answering some questions. The allegations do not show that the Mack superiors did more than ask questions even though they appeared angry. While their actions may be sufficient for a different cause of action (see discussion below on Count Four), the essential element of substantial intrusion into personal space or private material has not been alleged.

The court cannot conclude that asking questions about a person's private affairs, without some act of substantial intrusion into those affairs or the respondent's personal space or time, is sufficient to allege invasion of privacy as that cause of action is defined in the Restatement and interpreted by the Vermont Supreme Court.

Count Three is therefore dismissed.

## Count Four:  Intentional Infliction of Emotional Distress

Mr. Gates claims intentional infliction of emotional distress based on two incidents:

1. A June 18, 2020 letter from Mack's attorneys threatening Mr. Gates with a civil action under the federal wiretap statute and asserting a claim for $50,000 in attorneys' fees if he did not waive any claim of his own against Mack; and,
2. The May 6, 2019 event in which two Mack supervisors paraded Mr. Gates through the plant, isolated him in a room for a meeting which he did not feel free to leave, denied his request to speak with his attorney, and told him his job of 24 years depended on him answering questions about his conversations with his attorney concerning his secret recordings of Mack personnel.

The elements of the cause of action are most recently set forth by the Vermont Supreme Court as follows:

> The elements of an IIED claim are: "(1) conduct that is extreme and outrageous, (2) conduct that is intentional or reckless, and (3) conduct that causes severe emotional distress." *Thayer v. Herdt,* 155 Vt. 448, 455, 586 A.2d 1122, 1126 (1990). "An IIED claim can be sustained only where the plaintiff demonstrates 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.' " *Colby v. Umbrella, Inc.,* 2008 VT 20, ¶ 10, 184 Vt. 1, 955 A.2d 1082 (quoting *Boulton v. CLD Consulting Eng'rs, Inc.,* 175 Vt. 413, 427, 834 A.2d 37, 49 (2003)).

*Baptie v. Bruno*, 2013 VT 117, ¶ 24, 195 Vt. 308.

Mr. Gates relies on a prior case, *Crump v. P & C Food Markets, Inc.,* 154 Vt. 284 (1990), in which a jury awarded damages for IIED.  Plaintiff had been employed for 18 years when he was summoned without notice to a meeting which lasted three hours without a break for lunch and which he did not feel free to leave, during which he was "repeatedly badgered" to amend and sign a statement. Immediately after the meeting he was summarily dismissed.  While the Court noted that "mere termination of employment will not support a claim for intentional infliction of emotional distress," *Id.* at 296, it

denied defendant's motion for judgment notwithstanding the verdict, concluding that there was sufficient evidence to go to the jury.

As to the threatening letter of June 2020, Plaintiff alleges that Mack knew or had reason to know that Mr. Gates had not violated the wiretap statute, but nonetheless threatened a civil suit that caused Mr. Gates to worry about companion federal criminal prosecution and going to jail. Plaintiff also alleges that Mack's attorneys knew that the amount of $50,000 in attorneys' fees was grossly exaggerated and that the threat of such a claim against Mr. Gates, a factory worker, caused him emotional distress related to whether he could continue to support his family. At the time there was no litigation between Mack and Mr. Gates.

For purposes of notice pleading, Plaintiff has made sufficient allegations on each of the required elements sufficient to withstand a motion to dismiss. Plaintiff alleges that the letter contained serious threats allegedly known to be without factual bases, indicating that a jury could find them outrageous; the letter was clearly written intentionally by attorneys on behalf of Mack; and a jury could conclude that the fear of federal prison and being unable to support a family could cause severe emotional distress.

As to the May 6, 2019 meeting, the details of Plaintiff's allegations of an oppressive meeting conducted by Mack personnel are somewhat similar to those in *Crump,* which the Court found sufficient to support factfinding by the jury. The allegations are that Mr. Gates was paraded through the factory floor in an embarrassing manner, isolated in a room and badgered by two angry superiors without being free to leave, asked previously prepared questions about his conversations with his attorney, denied the opportunity to speak with his attorney, told that his job of over 24 years depended on his answering the questions, and then summarily suspended when he stopped answering their questions. The conduct appears clearly intentional, and jurors could conclude that it was "extreme and outrageous" and sufficient to cause severe emotional distress.

Defendants argue that the claims are precluded by the statute of limitations as to claims for emotional damages which are subject to the three-year statute of limitations. Plaintiff included claims for intentional infliction of emotional distress in the suit filed in federal court. Thus, under the analysis above, the effective filing date of that claim is May 6, 2022, which is exactly three years from the events of May 6, 2019, on which Mr. Gates relies to assert this claim for emotional distress. Accordingly, the claim is timely.

Thus, the Defendants' Motion to Dismiss is denied as to the claims for intentional infliction of emotional distress.

## Count Six: Promissory Estoppel

In his Complaint, Mr. Gates claims promissory estoppel based on a promise made in the May 6, 2019 meeting with managers "that he would keep his job if he answered their questions . . .and that they would conduct an investigation." (Complaint, ¶ 352.)  He alleges that their

promises induced his reliance and he answered some of their questions but he was then suspended and fired.  He seeks relief for the loss of his job.[13]

In a consistent series of cases over many years, the Vermont Supreme Court has adopted the Restatement standard for a claim of promissory estoppel.  "The doctrine of promissory estoppel, as recognized in Vermont, is set forth in the *Restatement (Second) of Contracts* § 90(1) (1981)." *Foote v. Simmonds Precision Prod. Co.*, 158 Vt. 566, 573 (1992).  The Restatement defines promissory estoppel as "[a] promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise." *Restatement (Second) of Contracts* § 90(1).  "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promise in understanding that a commitment has been made." *Id*. § 2(1).

Thus the four elements are: (1) a promise (2) that the promisor expects to induce action (3) that is relied on by the promisee in taking action or forbearance, and (4) injustice can be avoided only by enforcement.

In the context of employment, specificity is required.  The promise must be "a 'promise of a specific and definite nature before holding an employer bound by it.'" *Woolaver v. State*, 2003 VT 71, ¶ 30, 175 Vt. 379 (quoting *Dillon v. Champion Jogbra, Inc.*, 175 Vt. 1, 10 (2002)).  "The promise must be more than a mere expression of intention, hope, desire, or opinion, which shows no real commitment.'" *Pettersen v. Monaghan Safar Ducham PLLC*, 2021 VT 16, ¶ 13, 214 Vt. 269 (quoting, without internal quotation marks, *Nelson v. Town of St. Johnsbury Selectboard*, 2015 VT 6, ¶ 56, 198 Vt. 277).

The Vermont Supreme Court has concluded that various statements by an employer to an employee have been found inadequate for vagueness, lack of specificity, or lack of definiteness: an assurance that it would take four to six months for the employee to become comfortable performing a job, *see Dillon*, 175 Vt. at 10, and an opinion that it was reasonable to think that the plaintiff would have an opportunity to become a law firm partner and earn $100,000 annually in five years insufficient)., *see Pettersen*, 2021 VT 16, ¶ 14.  In *Nelson,* a statement from a town's attorney, not purporting to be a statement on behalf of the decision-making board, that plaintiff/town employee could be terminated only for "gross abuse of municipal funds and official discretion" was a mere expression of legal opinion, and not a promise to act in a certain way.  2015 VT 6, ¶¶ 56-57.  Similarly, in *Woolaver*, 2003 VT 71, ¶ 31, a promise of extended leave during the plaintiff-employee's pregnancy, and a right to reinstatement thereafter, was insufficient to guarantee that plaintiff would not be terminated for performance problems that arose after she returned to work upon completion of her leave.

---

[13] In his subsequently filed Outline of Claims, Mr. Gates gives two other "examples:" Defendant Bud Pagliccia promising that Mack employees could record without permission, and Defendant Nancy Ceflo promising that he could keep his old job title and pay and not have to do the die setting job.

Mr. Gates alleges that he relied on Defendants Fredette's and Pagliccia's promise that if he divulged his privileged conversations with his attorney during the meeting held on May 6, 2019, he would not lose his job. The promise alleged is sufficiently clear to meet the specificity requirement: 'answer our questions here and now and you will not lose your job.' Mr. Gates asserts that he relied on the promise in providing answers and such reliance was detrimental because, after answering questions, despite the promise, he still lost his job.

Defendants argue that Mr. Gates, knowing that he had secretly recorded work conversations, could not reasonably have expected to keep his job, regardless of Defendants' promises or inducements. They argue that reliance on a promise must be reasonable. Under the Restatement, however, the issue is whether the promisor should have foreseen reliance that would induce action or forbearance on the part of the promisee. *Compare Foote*, 158 Vt. at 573 ("The maker of such a statement in an employee handbook should expect action or forbearance on the part of the promisee as a result of the statement."), *with Madden v. Omega Optical, Inc.*, 165 Vt 306, 315 (1996) ("Unlike *Foote*, defendant here would not have reasonably expected that plaintiffs would misinterpret the handbook and that the handbook would thereby induce action or forbearance by plaintiffs.")

The reasonableness of the promisee's reliance comes into play only in relation to the fourth element of whether enforcement is necessary to avoid injustice. *See Restatement (Second) of Contracts* § 90(1), cmt. b ("The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the *latter requirement* may depend on the reasonableness of the promisee's reliance . . . .").

Mr. Gates alleges that he took the very action that Defendants' requested of him when they offered not to terminate him if he took such action: he divulged the substance of his communications with his attorney in reliance on Defendants' promise that his job would be not be in jeopardy as a consequence. His allegations are sufficient with respect to the requirements of a specific promise designed to induce action that did induce the exact action intended.

The final element of the promissory estoppel cause of action is whether injustice can be avoided only by enforcement of the promise, and calls for consideration of the following factors:

> (a) the availability and adequacy of other remedies, particularly cancellation and restitution;
> (b) the definite and substantial character of the action or forbearance in relation to the remedy sought ;
> (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;
> (d) the reasonableness of the action or forbearance; [and]
> (e) the extent to which the action or forbearance was foreseeable by the promisor.

*Restatement (Second) of Contracts* § 139(2) (1981).

Defendants do not argue a failure of allegation on the fourth element. Rather, they argue that due to prior misconduct on the part of Mr. Gates, it would be unjust to enforce Defendants' promise not to terminate him. This involves weighing of evidence and is not an issue to be decided on a motion to dismiss. If jurors find the other elements of the promissory estoppel claim have been proved, it is up to the jurors to determine whether an injustice can be avoided only by enforcement of the promise.

Thus, as to the promissory estoppel claim based on the May 6, 2019 meeting in which the promise was made that he would not be terminated if he answered questions, Plaintiff's allegations are sufficient and the Motion to Dismiss that claim is denied.

In order to avoid any controversy about scope of the claim(s) of promissory estoppel, the court will also rule on the two "examples" identified in Plaintiff's Outline of Claims although such claims are not clearly identified in ¶¶ 349-358 if the Complaint.

Mr. Gates alleges that he relied on Defendant Pagliccia's supposed promise that Mack Molding employees could secretly record workplace conversations without the consent of other parties. Mr. Gates does not specify how he may have been harmed by reliance on this supposed promise, though presumably he believes that he was terminated for having made over a dozen secret workplace recordings during 2019. However, the allegations in the Complaint are that Mr. Pagliccia explained to a group of supervisors at the plant that secret workplace recordings without consent of the other parties was *not unlawful*. There is no allegation that Mr. Pagliccia granted broad permission to all Mack Molding employees that they had free license to make secret workplace recordings at the Cavendish plant, nor did he promise that employees would be free from discipline if they engaged in such conduct. At most, Mr. Pagliccia expressed a legal opinion, which is not a commitment to take or not take a specific action in the future. *Cf. Nelson*, 2015 VT 6, ¶¶ 56-57. Thus, this claim fails for lack of a promise.

Mr. Gates also alleges that he relied on Defendant Nancy Ceflo's promise in November 2017 that he would not lose his job or pay as a result of his new assignment to perform die setting work, and that he was harmed in January 2019 when Defendant Fredette told him that Ms. Ceflo's promises were without effect. Mr. Gates does not allege any specific action or forbearance he took in reliance on Ms. Ceflo's statement that caused him to suffer injustice. The Complaint shows that Mr. Gates kept his job and his rate of pay after the Ceflo meeting, and even after learning from Jessica Fredette that the Ceflo promise was not enforceable. To the extent that Mr. Gates might be arguing that Ceflo's promise protected him from suspension and termination in 2019, Mr. Gates reads too much into the supposed promise. Much like the plaintiff in *Woolaver*, a promise of a right to keep a job is not an indefinite or absolute guarantee of employment regardless of subsequent performance issues or employee misconduct.

In sum, the Motion to Dismiss is denied with respect to the promissory estoppel claim based on the events of the May 6, 2019 meeting.[14] Plaintiff's cause of action for promissory estoppel based on the alleged promise that employees could record workplace conversations, and the cause of action based on a November 2017 representation that he could keep his old job, are dismissed.

## Count Eight:  Aiding and abetting

In the Complaint, Plaintiff makes general allegations that the individual Defendants committed "the aforementioned tortious and wrongful acts as part of a common design with each other," gave substantial assistance to the others, and breached a duty to Plaintiff.  (Compl., ¶ 365.)

In Plaintiff's Outline of Claims, Plaintiff alleges that Jeffrey Somple endorsed Jessica Fredette's retaliation of Plaintiff, that Jessica Fredette and Nancy Ceflo had various powers, and that Bud Pagliccia took Plaintiff out of his old job and reassigned him to die setting.

An "aiding and abetting" cause of action is also called "concerted action liability." The Vermont Supreme Court has specifically stated that it has:

> adopted the definition of concerted action liability as stated in the Restatement (Second) of Torts § 876 (1979). See *Montgomery v. Devoid,* 2006 VT 127, ¶ 33, 181 Vt. 154, 915 A.2d 270. This section provides that a person is subject to liability for harm to a third person from the tortious conduct of another if the person:
>
> (a) does a tortious act in concert with the other or pursuant to a common design with [the other person], or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct [himself or herself], or
> (c) gives substantial assistance to the other in accomplishing a tortious result and [the person's] own conduct, separately considered, constitutes a breach of duty to the third person.
> Restatement (Second) of Torts § 876.

*Concord Gen. Mut. Ins. Co. v. Gritman*, 2016 VT 45, ¶ 16, 202 Vt. 155.

Defendants seek dismissal, arguing that Plaintiff has not provided a factual basis relating each individual's action to a specific tortious act. Three torts have survived the Defendants' Motion to Dismiss:  (1) third party retaliation for reassignment to the die setting job; (2) intentional infliction of emotional distress, and (3) promissory estoppel.  Plaintiff has not set forth factual allegations as to the specific manner in which he alleges aiding and abetting by

---

[14] For reasons stated above, Defendants' statute of limitations defense to the claim of promissory estoppel is without merit.

individual Defendants with regard to these claims. Rather, the allegations use the generic language from the definition of the cause of action.

It appears that the actions of the individuals in the viable causes of action were undertaken in their capacity as agents of Defendant Mack Molding.  Plaintiff has not alleged individual motivation or action of aiding and abetting on the part of the individuals separate from their actions undertaken on behalf of Mack Molding.  Therefore, any claims against the individual Defendants for aiding and abetting are dismissed.

## Summary and Order

For the reasons set forth above, the following claims are not dismissed:

1. Claim for retaliation by reassigning Mr. Gates to the die setting job after his wife filed a lawsuit against Mack Molding for discrimination;
2. Claim of intentional infliction of emotional distress based on conduct at the May 6, 2019 meeting; and
3. Claim of promissory estoppel based on the May 6, 2019 promise that he would not lose his job if he answered questions.

All other claims and all claims against individual Defendants are dismissed with prejudice.

Defendants' counsel shall file an Answer to the above described claims within 14 days as provided in V.R.C.P. 12(a)(3)(A).

Within 21 days after the filing of the Answer, the attorneys shall submit either an agreed upon pretrial scheduling order, or their respective requests for such an order.

Electronically signed March 25, 2024 pursuant to V.R.E.F. 9 (d).

*Mary Miles Teachout*

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned

29